IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GARY SALAMONE, MIKE DURA, | § | |
| and ROBERT W. HALDER, | § | |
| | § | No. 343, 2014 |
| Defendants Below, | § | |
| Appellants/Cross-Appellees, | § | Court Below: |
| | § | |
| | § | The Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | Consol. C. A. No. 8845-VCN |
| JOHN J. GORMAN, IV, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee/Cross-Appellant. | § | |

Submitted: October 8, 2014
Decided: December 9, 2014

Before **STRINE**, Chief Justice, **HOLLAND**, **RIDGELY** and **VALIHURA**, Justices, **JOHNSTON**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART** and **REVERSED IN PART.**

Michael J. Maimone, Esquire (*argued*), Gregory E. Stuhlman, Esquire, and E. Chaney Hall, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware, for Appellants/Cross-Appellees.

Stephen B. Brauerman, Esquire (*argued*), Neil B. Glassman, Esquire, Vanessa R. Tiradentes, Esquire, and Sara E. Bussiere, Esquire, Bayard, P.A., Wilmington, Delaware, for Appellee/Cross-Appellant.

**VALIHURA**, Justice:

---

[*] Sitting by designation pursuant to Del. Const. Art. IV § 12.

Defendants Below, Appellants/Cross-Appellees Gary Salamone ("Salamone"), Mike Dura ("Dura") and Robert W. Halder ("Halder," and together with Salamone and Dura, the "Management Group") appeal from a Court of Chancery Memorandum Opinion dated May 29, 2014, and Order and Final Judgment dated June 24, 2014.

This case involves a dispute between two competing sets of stockholders and directors about the composition of the board of Westech Capital Corporation ("Westech"), a financial services holding company headquartered in Austin, Texas. Both parties brought actions in the Court of Chancery pursuant to 8 *Del. C.* § 225 (the "§ 225 actions"), each contending that their respective slates of directors constitute the valid board. The crux of the case for both sides is the interpretation of a Voting Agreement signed by the purchasers of Westech Series A Preferred stock (the "Series A Preferred Stock") in September 2011. According to John J. Gorman, IV ("Gorman"), the founder of the company and its majority stockholder, the Voting Agreement provides for a *per share* scheme and entitles him to remove and designate new directors, as he purported to do in 2013.

According to the Management Group, all of whom were employees and directors of Westech at the time of the trial, the Voting Agreement provides for a *per capita*, not a *per share*, scheme. Because Gorman's attempt to remove and replace directors was not approved by a majority of the (individual) holders of the

1

preferred stock (as opposed to the holders of a majority of shares), they argue that Gorman's attempts to change the board composition were invalid.

On August 27, 2013, both parties filed § 225 actions in the Court of Chancery. The two cases were consolidated, with Gorman as plaintiff and the Management Group as defendants. The Court of Chancery's Memorandum Opinion, issued on May 29, 2014, held that one clause of the Voting Agreement set forth a *per capita* scheme to designate directors, but another contested provision set forth a *per share* scheme to designate directors. Thus, the Court of Chancery determined that Gorman's actions were only partially valid, and that the Westech board consisted of two members of the Gorman slate and two members of the Management slate, with three vacant seats. Both parties appealed to this Court, arguing that the Court of Chancery's decision was partially incorrect.

The Management Group raises three issues on appeal relating to the interpretation of the Voting Agreement. They assert that: (1) the trial court erred in holding that the director candidates are designated under Section 1.2(b) by the vote of a majority of "shares" rather than the individual "holders" of Series A Preferred Stock; (2) the trial court correctly held that the director candidates are designated under Section 1.2(c) by a majority vote of the individual Key Holders, but erred in holding that the directors who are Key Holder Designees may be removed by a majority vote of the Series A Preferred Stock controlled by the Key

2

Holders; and (3) the trial court erred in holding that Section 7.17 did not mandate the aggregation of stock transferred by a Series A Preferred stockholder to "Affiliates" for purposes of the *per capita* scheme.

In his cross-appeal, Gorman contends that the Court of Chancery erred in holding that the Key Holder Designees are designated on a *per capita* basis. He further contends that the Court of Chancery erred in holding that a *per capita* scheme would not violate Section 212(a) of the Delaware General Corporation Law ("DGCL").

We affirm in part and reverse in part.

## I.  FACTUAL AND PROCEDURAL HISTORY[1]

### A.       *The Company and the Parties*

Westech, which was founded in 1994 and became a public company in 2001, is a holding company with one primary operating subsidy, a broker-dealer named Tejas Securities Group, Inc. ("Tejas"). Gorman was one of seven founding members of Westech, and served as the chairman of Westech's Board from 1999 through August 2013. He was also the majority stockholder of Westech common stock and of the total voting shares at all relevant times. Westech has two classes of stock authorized and outstanding:  4,031,722 shares of common stock, and 338

---

[1] The relevant facts are drawn from the record and the Court of Chancery's Memorandum Opinion. *In re Westech Capital Corp.*, 2014 WL 2211612 (Del. Ch. May 29, 2014) [hereinafter *Westech*].

3

shares of Series A Preferred Stock. The Series A Preferred Stock votes together with the common stock on an as-converted basis, and each share of Series A Preferred Stock is entitled to cast 25,000 votes. According to the parties' pre-trial stipulation, Gorman owns, directly or indirectly, approximately 2.4 million shares of common stock (or nearly 60% of Westech's common stock outstanding), and approximately 173 shares of Series A Preferred Stock (or 51% of the 338 shares outstanding).[2] Because Westech's Series A Preferred stockholders have 25,000 votes for every one share of Series A Preferred Stock, Gorman holds nearly 54% of Westech's total voting power.

Neither Dura nor Salamone has ever owned Westech stock. Dura, who served as interim Chief Executive Officer ("CEO") before Salamone, was elected to the board in late 2012.[3] Salamone became CEO of Westech sometime in early 2013, and has served on the board since that time. Halder has been involved with the company since 2002. He has served as President and acting Chief Operating Officer ("COO") of Westech, and interim COO of Tejas. He was also elected to Westech's board in or around 2009.[4] He owns, directly or indirectly, nine shares

---

[2] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B4.

[3] The previous CEO, James B. Fellus, was terminated in October 2012, according to Anthony Peter Monaco's deposition testimony. App. to Appellant's Opening Br. at A1057. Gorman testified that he discussed having Dura join the board in August 2012, before Dura became an employee of Westech. App. to Appellant's Opening Br. at A1230.

[4] Halder could not recall during his deposition the exact date he was elected to the Board. App. to Appellant's Opening Br. at A804-05.

of Series A Preferred Stock in the company.  Halder resigned as a Westech employee in June 2014.

### B.      The Series A Preferred Stock Transaction

According to the Management Group, Gorman's mismanagement and profligate spending caused Westech to experience severe financial distress from 2005 to 2011, particularly a rapid decline in net capital in 2011.  Because of the nature of Westech's business, the crisis could have been fatal:  the company was required to maintain minimum capital levels by its counterparties, clearing houses, and its regulator, the Financial Industry Regulatory Authority ("FINRA").  As a result, the company needed an infusion of capital.

Gorman disputes this account of events.  He alleges that Westech raised capital in 2011, not because of financial distress, but instead because of his desire to expand the sales base of the business and to acquire other broker-dealers.[5] Nonetheless, the parties do not dispute that the company issued a new series of Series A Preferred stock and Series A Convertible Notes in the fall of 2011.  Four primary groups of investors bought these shares:  (1) James J. Pallotta ("Pallotta"),

---

[5] In his affidavit, Gorman states that:  "In the months leading up to the Series A Preferred offering, Westech had sufficient capital reserves to satisfy FINRA's regulatory requirements and the requirements of APEX Clearing Corporation.  In addition to its cash on hand, Westech also had access to a $1 million letter of credit if it needed capital reserves.  We planned to use the additional capital raised by the issuance of Series A Preferred Stock for growth and expansion, whether internally or by acquisition."  App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B882-83.  Halder disputes these assertions in his affidavit.  *See* App. to Appellant's Reply Br. and Cross-Appellant's Answering Br. at AR161.

a friend and long-time client of Gorman's; (2) James B. Fellus ("Fellus"), who had been a consultant to Westech but became CEO after the transaction, and members of Fellus' family; (3) a group of Westech employees, including Halder; and (4) Gorman himself.

| Investor | Investment | Shares |
|----------|-----------|--------|
| Pallotta | $2M | 80 (preferred only) |
| Fellus | $600,000 cash + $1M note[6] | 64 (preferred and notes) |
| Employees | $2M | 81 (preferred and notes)[7] |
| Gorman | $1.8M | 72 (preferred and notes) |

### C.    The Voting Agreement

As part of the Series A Preferred Stock transaction, the parties executed a Voting Agreement on September 23, 2011.[8]  The Voting Agreement was signed by Halder, Gorman (including as custodian for other accounts), Pallotta, Fellus, and approximately 25 other investors, most of whom were employees who purchased

---

[6] Fellus never made any of the payments owed on the note, and eventually defaulted.  Westech filed a lawsuit against him in the United States District Court for the Western District of Texas for his default on the promissory note.  *Westech*, 2014 WL 2211612, at *1, n.10.  They also engaged in arbitration proceedings through FINRA Dispute Resolution, in which Fellus was ordered to pay Westech and Tejas approximately $1 million.  App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B35-41.  Fellus claimed in his deposition that he believed Westech (particularly Gorman) was engaging in "fraudulent activity" and did not want to "put more good money behind bad money."  App. to Appellant's Opening Br. at A708, A729.

[7] *See* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1111; Voting Agreement Schedule A, App. to Appellant's Opening Br. at A612-18.

[8] The parties also executed other documents, including indemnification agreements, an investor rights agreement, and a co-sale agreement, as part of the same transaction.

6

only one or two shares.[9] There are only a few independent holders of Westech common stock who are not bound by the Voting Agreement. According to the Voting Agreement itself, its purpose was to ensure that the new investors would be represented on the board: "in connection with [the Series A Preferred Stock Purchase Agreement] the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company. . . ."[10]

Before the Series A Preferred Stock issuance, Westech's board consisted of Gorman, Gorman's uncle (Charles Mayer), and Halder. Under Section 1.2 of the Voting Agreement, the Board expanded to seven members with the members to be determined as follows:

> 1.2    Board Composition. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:

> (a)    One person designated by Mr. James J. Pallotta ("Pallotta") (the "Pallota [sic] Designee"), for so long as Pallotta or his Affiliates continue to own beneficially at least ten percent (10%) of the shares of

---

[9] Voting Agreement, Schedule A, App. to Appellant's Opening Br. at A612. The Management Group contends in their brief that although Schedule A to the Voting Agreement lists 48 holders, pursuant to Section 7.17, shares held by affiliated persons and entities are aggregated, and that after aggregating the holdings listed, there are 26 holders. Appellant's Opening Br. at 15, n. 2.

[10] Voting Agreement Recitals, App. to Appellant's Opening Br. at A539.

7

Series A Preferred Stock issued as of the Initial Closing (as defined in the Purchase Agreement);

(b)     One person who is an Independent Director and is designated *by the majority of the holders of the Series A Preferred Stock* (together with the Pallotta Designee, the "Series A Designees");

(c)     Two persons *elected by the Key Holders*, who shall initially be John J. Gorman IV and Robert W. Halder (the "Key Holder Designees");

(d)     The Company's Chief Executive Officer, who shall initially be James Benjamin Fellus (the "CEO Director"), provided that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Company, each of the Stockholders shall promptly vote their respective Shares (i) to remove the former Chief Executive Officer from the Board if such person has not resigned as a member of the Board and (ii) to elect such person's replacement as Chief Executive Officer of the Company as the new CEO Director; and

(e)     Two individuals with applicable industry experience not otherwise an Affiliate (defined below) of the Company or of any Investor and who are Independent Directors mutually acceptable to the Series A Designees and the Key Holder Designees of the Board.

To the extent that any of clauses (a) through (e) above shall not be applicable, any member of the Board who would otherwise have been designated in accordance with the terms thereof shall instead be voted upon by all of the stockholders of the Company entitled to vote thereon in accordance with, and pursuant to, the Company's Restated Certificate of Incorporation, including the Series A Preferred Stock Certificate of Designation.

For purposes of this Agreement, an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity (collectively, a "Person") shall be deemed an "Affiliate" of another Person who directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any spouse or child of such Person, or trust or similar entity which controls, is controlled by or is under common control with such Person or any general partner, managing member, officer or director

of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares in the same management company with, such Person. For purposes of this Agreement, "Independent Director" has the meaning set forth in Nasdaq Rule 5605(a)(2).[11]

The parties also based their arguments on other provisions of the Voting Agreement, including Section 1.4 which addresses the removal of Board members as follows:

> 1.4 <u>Removal of Board Members</u>. Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:
>
> (a) no director elected pursuant to Sections 1.2 or 1.3 of this Agreement may be removed from office unless (i) such removal is directed or approved by the *affirmative vote of the Person*, or of the *holders of more than fifty percent (50%) of the then outstanding Shares entitled under Section 1.2 to designate that director* or (ii) the Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to Section 1.2 is no longer entitled to designate or approve such director or occupy such Board seat;
>
> (b) any vacancies created by the resignation, removal or death of a director elected pursuant to Sections 1.2 or 1.3 shall be filled pursuant to the provisions of this Section 1; and
>
> (c) upon the request of any party entitled to designate a director as provided in Section 1.2(a), 1.2(b) or 1.2(c) to remove such director, such director shall be removed.
>
> If permitted by applicable law, the Board shall execute any written consents required to remove a director or to fill a vacancy created by resignation, removal or death pursuant this Agreement, and, if required by applicable law, all Stockholders agree to execute any

---

[11] Voting Agreement § 1.2, App. to Appellant's Opening Br. at A540 (emphasis added).

9

written consents required to remove a director or to fill a vacancy created by resignation, removal or death pursuant this Agreement, and the Company agrees at the request of any party entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors if such a special meeting of stockholders is required by applicable law.[12]

The meaning and importance of Section 7.17 was also disputed during the trial. That provision provides:

7.17 <u>Aggregation of Stock</u>. All Shares held or acquired by an Investor and/or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.[13]

The parties presented sharply different versions of the negotiating history that led to the Voting Agreement. Gorman claimed that the new board structure was meant to appease his friend, Pallotta, by providing him with a designated board seat and to ensure that together, they would "own a majority of the fully diluted shares."[14] By contrast, the Management Group contended that the Voting Agreement was intended to limit Gorman's control over the board by bringing in other constituents, namely: Westech employees, represented by Halder; management, represented by the CEO; and the other major investor, Pallotta. Before the Series A Preferred Stock issuance, Gorman owned the majority of

---

[12] Voting Agreement § 1.4, App. to Appellant's Opening Br. at A541 (emphasis added).

[13] Voting Agreement § 7.17, App. to Appellant's Opening Br. at A550.

[14] *Westech*, 2014 WL 2211612, at *5.

10

common shares, and by all accounts dominated Westech's board. Various members of the Management Group testified that the purpose of the Agreement was to replace Gorman's one-man rule with a "triumvirate" of Halder, Fellus, and Gorman, which would reportedly encourage compromise.[15]

### D. Gorman's Attempt to Regain Board Control

By 2013, when the events leading to this case occurred, Salamone had replaced Fellus as the CEO, and therefore as the designated CEO Board member.[16] Pallotta eventually designated his employee, Anthony Peter Monaco, Jr. ("Monaco"), to fill the Pallotta Designee seat under Section 1.2(a) of the Voting Agreement. Pallotta did not designate Monaco, who had negotiated the Voting Agreement with Westech on Pallotta's behalf, until March 2012, five months after the Series A Preferred Stock offering closed. According to Monaco's deposition testimony, the delay was caused by Pallotta's fear of over-committing Monaco, and Pallotta's apparent belief that he did not need immediate representation on Westech's board because he trusted Westech's management. Only after Pallotta's attorney resigned and "there was no one to advise him against it" did Pallotta designate his preferred director.[17] As specified in Section 1.2(c) of the Voting

---

[15] *See* App. to Appellant's Opening Br. at A879, A695-96, A1010, A1074-75. *See also Westech*, 2014 WL 2211612, at *6 ("[The Management Group] argue[s] that the possibility of deadlock would encourage compromise.").

[16] As noted, Dura replaced Fellus as interim CEO, and was then replaced by Salamone.

[17] App. to Appellant's Opening Br. at A1026-28.

Agreement, Gorman and Halder held the two Key Holder director seats. Finally, Dura held a Board seat as one of the independent directors referenced in Section 1.2(e). The remaining two seats (*i.e.*, the other Series A designee under Section 1.2(b) and the other Independent Director under Section 1.2(e)) were vacant.[18]

Gorman resigned from the board effective August 7, 2013.[19] Both sides engaged in finger-pointing. The Management Group asserted at trial that Gorman was unhappy as he could no longer use Westech as his "personal piggy-bank."[20] Gorman testified that he left because he disagreed with Halder and Salamone's leadership. One week after resigning, Gorman sent a letter to Westech attempting to remove Halder from the Board and elect Greg Woodby in his place. The letter stated that Gorman was acting as the holder of more than fifty percent of the issued and outstanding Westech voting stock held by the Key Holders. He also purported to elect Barry Williamson to fill the Key Holder seat vacancy.[21] Gorman's letter cited Sections 1.2 and 1.4 of the Voting Agreement as his authority to elect or remove Key Holder Designees as the majority stockholder.

---

[18] According to Fellus' deposition, immediately after the Agreement was signed, the board consisted of Halder, Monaco, Gorman and Fellus; Dura was only added "just prior to [Fellus'] leaving." App. to Appellant's Opening Br. at A660.

[19] Thus, as of August 7, 2013, the Board consisted of Messrs. Dura, Halder, Monaco and Salamone, with three vacancies.

[20] *Westech*, 2014 WL 2211612, at *7.

[21] App. to Appellant's Opening Br. at A635.

On August 21, 2013, Gorman entered into a Stock Purchase Agreement with Pallotta in which Gorman obtained control over Pallotta's 80 shares of Series A Preferred stock.[22] Pallotta's designee, Monaco, later resigned from the Board. While the sale was pending,[23] Pallotta issued to Gorman a proxy to vote his shares. At the same time, Gorman attempted to elect himself to the Board as the Pallotta Designee, and to designate Barry A. Sanditen to the other Series A Designee seat, by written consents signed by Gorman and four other stockholders.[24]

Two days later, the purported new directors (Gorman, Sanditen, Woodby, and Williamson) attempted to call a board meeting for August 26, 2013. Dura and Salamone, the remaining undisputed directors, were given notice of the meeting, but did not attend. At that meeting, the purported Board voted to remove Dura and elect Daniel Olsen and T.J. Ford to serve as the Section 1.2(e) independent directors.

Westech's Annual Meeting took place as scheduled on September 17, 2013. The two competing sets of directors presented different slates for election by the stockholders:

---

[22] App. to Appellant's Opening Br. at A636-37. A trust in Gorman's wife's name purchased Pallotta's shares along with Gorman under the Purchase Agreement.

[23] According to Section 2.12(c) of the Investor Rights Agreement, no preferred stock could be sold without first notifying the company. App. to Appellant's Opening Br. at A235. Gorman's attorney was apparently concerned about receiving "some pushback from certain people at the Company as to the validity of the sale." App. to Appellant's Opening Br. at A647.

[24] App. to Appellant's Opening Br. at A623-34. The other stockholders were Arch Aplin, Williamson, Woodby, and Ford.

13

| Board seat | Gorman Slate[25] | Management Slate |
|---|---|---|
| (a) Pallotta designee | Gorman | *Vacant* |
| (b) Other Series A designee | Ford | Mark McMurrey |
| (c) Key Holder designee (1) | Woodby | Halder |
| (c) Key Holder designee (2) | Williamson | Michael Wolf |
| (d) Westech CEO | Salamone | Salamone |
| (e) Independent director (1) | Olsen | Dura |
| (e) Independent director (2) | Sanditen | *Vacant* |

Gorman's slate garnered the majority of votes with 5,969,288 votes cast in favor of the Gorman slate and 3,375,000 votes cast in favor of the Management slate.[26] The vote tally was confirmed by an independent inspector, Corporate Election Services, Inc.

The Management Group claims that Gorman's nomination of a separate slate of directors violated the terms that he had agreed to under the Voting Agreement. Because they read the Voting Agreement as providing for a *per capita*, not a *per share*, scheme, they argued before the Court of Chancery, and now on appeal, that Gorman was not entitled to nominate his own slate. They contend that Gorman could only nominate the Pallotta Designee, and then only after the proxy from Pallotta became effective.[27] For the other board seats, they

---

[25] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B10. It is not clear why Gorman's September 17 slate did not match his previous designations of the board seats.

[26] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B10.

[27] The Management Group claims that Gorman backdated Pallotta's proxy, and there is some evidence that supports this contention. The parties' Pre-Trial Stipulation states that, "[a]lthough the Pallotta Proxy states that it is effective as of August 21, 2013, the Pallotta Proxy was executed by Mr. Pallotta on or around September 5, 2013." App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B8. The record does not indicate more precisely when the

14

allege Gorman had just one vote, and would have to agree with "the majority of the [other] holders of the Series A Preferred Stock" to designate the remaining Series A designee under Section 1.2(b); agree with the other Key Holders on the two Key Holder Designees under Section 1.2(c); and, as the Pallotta Designee, agree with the Series A Designees and the Key Holder Designees on the two Independent Directors under Section 1.2(e).

Gorman disputes this interpretation, and argues instead that the Voting Agreement provides for a *per share* scheme. Under Gorman's reading, because he held more than 50% of the Series A Preferred Stock entitled to elect the Key Holder Designees, he could remove and elect those two directors under Section 1.2(c). As the majority holder of the Series A Preferred Stock, he maintains that the Series A Designees are designated by a majority of the holders of the Series A Preferred Stock measured on a *per share* basis. He argues further that Section 1.4(a) allows him to remove any Series A Designee as a holder of the majority of the shares of the Series A Preferred Stock. Gorman argued that any other reading of the Voting Agreement would be incompatible with Section 212(a) of the

proxy was executed and delivered. However, as long as the proxy been executed and delivered before the September 17, 2013, Annual Meeting, Gorman's election to the board at the Annual Meeting would be valid under the terms of the Voting Agreement, even if his Written Consent on August 21, 2013, was not valid.

15

DGCL,[28] which requires any departure from the default "one share/one vote" principle to appear in the certificate of incorporation. Westech's Restated Certificate of Incorporation provides for no such deviation, and instead explicitly provides for "one vote for each share of Common Stock."[29]

### E. The Court of Chancery Proceedings

On August 27, 2013, after Gorman sent his written consents to Westech but before the Annual Meeting scheduled on September 17, 2013, Gorman and the Management Group each filed separate § 225 actions in the Court of Chancery. The Court of Chancery consolidated the two cases, designating Gorman as the plaintiff. Although both sides filed motions for judgment on the pleadings, asserting that the Voting Agreement was clear and unambiguous, the Court of Chancery found on the basis of the pleadings that Sections 1.2(b) and 1.2(c) were ambiguous. The parties engaged in additional discovery to resolve the ambiguity through extrinsic evidence. The Court conducted a trial on a stipulated record on January 24, 2014, and issued its Memorandum Opinion on May 29, 2014, with an Order and Final Judgment on June 24, 2014. We observe that the trial court was

---

[28] 8 *Del. C.* § 212(a) ("Unless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder. If the certificate of incorporation provides for more or less than 1 vote for any share, on any matter, every reference in this chapter to a majority or other proportion of stock, voting stock or shares shall refer to such majority or other proportion of the votes of such stock, voting stock or shares.").

[29] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1350.

left to discern the parties' intent from a paper record that is devoid of the kind of

context that can often be critical in determining why the parties drafted the

provisions as they did.

Not surprisingly, in view of the record, the Court of Chancery found that the

negotiating history of the Voting Agreement was "not particularly illuminating"[30]

in determining whose account of these negotiations was more accurate.[31] The

Voting Agreement was based on a form agreement found on the website of the

New Venture Capital Association (the "Model Voting Agreement"). Only

minimal changes were made to the Model Voting Agreement by the parties. For

---

[30] *Westech*, 2014 WL 2211612, at *6.

[31] Halder claims in his deposition that one reason for the lack of contemporaneous written evidence regarding the intent to construct Section 1.2(b) as providing for a *per capita* scheme is Gorman's practice to have few negotiations in writing. Halder testified as follows:

> [Gorman's Counsel] Q: So other than the deal documents, do you have any emails that reflect that, do you have any documents that reflect that, do you have any letters between you and Mr. Gorman, do you have any contemporaneous notes, do you have any evidence other than what you say the intent is to substantiate your claim that that's what the intent was?

> [Management Group's Counsel] A: Object to form.

> [Halder] A: Mr. Gorman, through the twelve years that I've known him, has a saying -- I'm sure he'll smile through the phone as I say this -- *that you're the master of the spoken word and you're a slave to the written word*. That was how John approached this -- the entirety of this negotiation. And what I will tell you is, and you will see for yourselves as you go through these depositions, the recollection of the parties I believe will end up being far more consistent, with my interpretation of the documents than it is with your interpretation of the documents.

App. to Appellant's Opening Br. at A929-30 (emphasis added). We note that this approach is not particularly helpful to anyone here -- including the courts, which have had to spend considerable resources attempting to divine the parties' intent. Gorman's view, if sanctioned, "would permit a sophisticated party to exploit ambiguities in contracts to extract a better bargain for itself after the fact, knowing that the court would have to remain blind to parol evidence that would make untenable its view of the contract." *Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 313 (Del. Ch. 2002).

example, a comparison of Section 1.2(c) of the Model Voting Agreement shows that "the holders of a majority of the Shares of Common Stock" was changed to "the majority of the holders of the Series A Preferred Stock" in what is now Section 1.2(b) of the Voting Agreement.[32] Also, language in what is now Section 1.2(c) of the Voting Agreement describing the Key Holder Designees was altered from "one individual designated by the holders of a majority of the shares" to "two persons elected by the Key Holders,"[33] who were defined later in the Voting Agreement.[34]

Similarly, the Voting Agreement in Section 1.2(e) replaced the Model Voting Agreement's language regarding an independent individual "mutually acceptable to (i) the holders of a majority of the Shares held by the Key Holders . . . and (ii) the holders of a majority of the Shares held by the Investors" with "Independent Directors mutually acceptable to the Series A Designees and the Key Holder Designees of the Board."[35] Section 1.4, which addresses removing directors, and Section 7.17, which addresses aggregating shares for the purposes of

---

[32] *Compare* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1322 *with* App. to Appellant's Opening Br. at A540.

[33] *Compare* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1322 *with* App. to Appellant's Opening Br. at A540.

[34] *See* Voting Agreement Schedule B, App. to Appellant's Opening Br. at A619.

[35] *Compare* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1323 *with* App. to Appellant's Opening Br. at A540.

determining rights under the agreement, were both lifted verbatim from the Model Voting Agreement.

The Court of Chancery found no contemporaneous evidence explaining how the Key Holders were chosen. Pallotta was, at one point, listed as a Key Holder, not Halder, and the Court of Chancery could not find a satisfactory explanation for this change.[36] The Model Voting Agreement merely notes in a footnote that "in most cases investors will want the term 'Key Holders' to include major common stock or option holders in addition to the individuals who actually founded the Company," but does not contain a provision detailing how these holders are designated or removed.[37]

The Court of Chancery also found no contemporaneous evidence to support the Management Group's triumvirate theory, or their broader claim about the need to limit Gorman's control over the board. The word "triumvirate" did not appear in any document from the 2011 negotiations, despite the assertions by Monaco, Halder, and Salamone in their respective depositions that the purpose of the Voting Agreement was to create such a three-headed regime.

After reviewing this evidence and the text of the Voting Agreement as a whole, against the preference in Delaware for a *per share* scheme unless the

---

[36] *Westech*, 2014 WL 2211612, at *6, n.39 ("After-the-fact testimony has been offered to explain how Halder joined the Board, but, as discussed below, the Court does not find those explanations to be as credible as contemporaneous documentary evidence.").

[37] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at 1320.

relevant governing documents clearly specify otherwise, the Court of Chancery ultimately held that Section 1.2(b) of the Voting Agreement provides for a *per share* scheme, but that Section 1.2(c) provides for a *per capita* scheme. It further held that the Voting Agreement did not violate 8 *Del. C.* § 212(a) because Section 218 of the DGCL explicitly permits stockholders "to construct a contractual overlay on top of that mechanism to agree to vote their shares in accordance with [a] more specific scheme."[38]

According to the Court of Chancery, the parties did not make "nuanced arguments" about the right of removal in Section 1.4 during the trial, but instead referenced Section 1.4 only to support their respective arguments about Section 1.2. Nonetheless, the Court of Chancery had to interpret Section 1.4 to determine whether Gorman's attempt to remove Halder was valid. The Court held that Section 1.4(a) explicitly "permits the holders of more than fifty percent of the then outstanding shares (which includes the holder's common shares) entitled under Section 1.2 to designate a director to remove that director."[39] Because Gorman was the majority stockholder in August 2013, the Court of Chancery concluded that he was entitled to remove Halder from the board.

---

[38] *Westech*, 2014 WL 2211612, at *18.

[39] *Id.* at *19.

Accordingly, the Court of Chancery found that Gorman's removal of Halder as the Key Holder Designee was valid, but that Gorman's attempts to elect Woodby and Williamson were not because Gorman did not have the consent of the other Key Holders. The Court of Chancery also found that Gorman's attempts to remove Dura and elect Olsen and Ford as independent directors under Section 1.2(e) were invalid because the other Key Holders did not approve. It concluded that the remaining three seats (including the two Key Holder seats) were vacant. According to the Court of Chancery, the Board of Westech consists of:

| §1.2(a) Pallotta | §1.2(b) Series A | §1.2(c) Key 1 | §1.2(c) Key 2 | §1.2(d) CEO | §1.2(e) Ind. 1 | §1.2(e) Ind. 2 |
|---|---|---|---|---|---|---|
| Gorman | Ford | [Vacant] | [Vacant] | Salamone | Dura | [Vacant] |

On appeal, both parties contend that the Court of Chancery erred. Gorman claims that the trial court erred, and that Salamone, Gorman, Williamson, Sanditen, Woodby, Olsen and Ford were all validly elected as members of the Westech Board. The Management Group also contends the trial court erred, but that Salamone, Halder, Dura, Wolf and McMurray were all validly elected as members of the Westech Board. We do not agree with either side and affirm the Court of Chancery's ruling that Section 1.2(b) sets forth a *per share* scheme and Section 1.2(c) sets forth a *per capita* scheme. However, we conclude that the Court of Chancery erred in holding that the directors designated pursuant to Section 1.2(c) may be removed by the vote of the majority of the shares held by the Key Holders.

21

Instead, under the plain language of Section 1.4(a), the Key Holders, as the "Person[s]" entitled to nominate the Key Holder Designees, are the only "Person[s]" entitled to remove the Key Holder Designees. Put more broadly, the plain language of Section 1.2 and Section 1.4(a) suggests that the designation and removal provisions were intended to be symmetrical.[40] Because of its error regarding Section 1.4(a), we find that the Court erred in holding the removal of Halder to be valid.

In reaching these conclusions, we hold that certain of the Court of Chancery's factual findings were clearly erroneous. However, these errors were not of sufficient force to affect the Court of Chancery's overall conclusions regarding Sections 1.2(b) and 1.2(c) set forth above. In addition, we affirm the Court of Chancery's conclusion that Gorman's attempt to remove Dura was invalid and that Ford was validly elected under Section 1.2(b). Accordingly, we AFFIRM in part and REVERSE in part.

## II. DISCUSSION

### A. Our Standard of Review

We review questions of contract interpretation *de novo*. "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be

---

[40] The parties could have been clearer when referring to "Person" in Section 1.4(a) by appending "(s)" to "Person." Instead, it appears that the parties lifted the text from the Model Voting Agreement.

that which would be understood by an objective, reasonable third party."[41] When interpreting a contract, this Court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all its provisions.[42] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[43] "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract."[44]

### B. Section 1.2(b) is a Per Share Provision

### 1. The Management Group's Contentions

The Management Group argues that Section 1.2(b) of the Voting Agreement is clear and unambiguous, and thus, there is no need to consider any extrinsic evidence. They contend that by using the language "majority of the holders," the parties purposefully chose to avoid using other language referencing the majority of the shares or stock as used throughout the DGCL.[45] They further argue that the

---

[41] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[42] *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[43] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[44] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003).

[45] *See, e.g.*, 8 *Del. C.* § 242(b)(1) ("a majority of the outstanding stock"); 8 *Del. C.* § 251(c) ("a majority of the outstanding stock"); 8 *Del. C.* § 275(b) ("a majority of the outstanding stock"); 8 *Del. C.* § 271(a) ("the holders of a majority of the outstanding stock"); 8 *Del. C.* § 141(k) ("the holders of a majority of the shares").

23

"majority of the holders" language differs from sections of the Voting Agreement that explicitly use majority of the shares or stock language.[46] Additionally, the Management Group argued to the Court of Chancery that Black's Law Dictionary defines "holder" as "[a] *person* who possesses or uses property."[47] On appeal, the Management Group cites to the Court of Chancery's statement below that "[a] plain reading by a reasonable third party that inquires no further would support [Appellants'] *per capita* voting theory."[48] Therefore, they argue, the plain meaning of Section 1.2(b) is unambiguous and provides for a *per capita* scheme.

### 2. Gorman's Contentions

Gorman also argues that Section 1.2(b) is unambiguous. However, he argues that it is unambiguously a *per share* provision. He contends that other provisions in the Voting Agreement reference a *per share* scheme more directly,[49]

---

[46] *See* Voting Agreement § 1.4(a), App. to Appellant's Opening Br. at A541 ("the holders of more than fifty percent (50%) of the then outstanding Shares"); Voting Agreement § 4.1, App. to Appellant's Opening Br. at A542 ("shares representing more than fifty percent (50%) of the outstanding voting power of the Company"); Voting Agreement § 4.2, App. to Appellant's Opening Br. at A542-43 ("the holders of at least two-thirds (66 2/3%) of the shares of the Series A Preferred Stock"); Voting Agreement § 4.4, App. to Appellant's Opening Br. at A545 ("the holders of at least two-thirds of the Series A Preferred Stock"); Voting Agreement § 7.8, App. to Appellant's Opening Br. at A547 ("the holders of two-thirds of the shares of Series A Preferred Stock"); Voting Agreement § 7.8(e), App. to Appellant's Opening Br. at A548 ("the holders of a majority of shares of Series A Preferred Stock").

[47] Black's Law Dictionary (9th ed. 2009) (emphasis added).

[48] *Westech*, 2014 WL 2211612, at *15.

[49] *See* footnote 46, *supra*. Gorman also points to a number of cases that appear to use the phrase "majority of the holders" to mean a majority of the voting power of the company. *See, e.g.*, *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *25 (Del. Ch. Oct. 11, 2013); *Dawson v. Pittco Capital Partners, L.P.*, 2012 WL 1564805, at *11, *19 (Del. Ch. Apr. 30, 2012); *Telcom-*

24

but the entire scheme of the agreement was intended to be *per share*, even if different language was used to describe the designation and voting mechanisms.

For example, Gorman contends that the removal provisions in Section 1.4 require only a majority vote to remove directors designated under Sections 1.2(b) and 1.2(c). As a result, a majority stockholder could remove any director designated through a *per capita* vote under Sections 1.2(b) and 1.2(c). If Section 1.2(b) provides for a *per capita* scheme, Gorman argues that the combined effect of the designation and removal provision would lead to an "unreasonable result."[50] Gorman contends that the Management Group's position that the provisions were designed specifically to create a never-ending sequence of election and removal is irrational and unsupported by the evidence.

Further, Gorman contends that the Voting Agreement's structure and the Series A Preferred stock agreements as a whole do not restrict transfers.[51] If the

---

*SNI Investors, L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *6, n.20 (Del. Ch. Sept. 7, 2001); *Solomon v. Armstrong*, 747 A.2d 1098, 1127 (Del. Ch. 1999); *Margolies v. Pope & Talbot, Inc.*, 12 Del. J. Corp. L. 1092, 1097 (Del. Ch. 1986); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 490 (Del. Ch. 1923).

[50] *See* Appellee's Answering Br. and Cross-Appellant's Opening Br. at 38. The Management Group counters that the parties intended to create compromise through checks and balances. The Court of Chancery acknowledged Gorman's argument that "these provisions do not create a workable triumvirate structure or scheme of checks and balances and instead produce deadlock." *Westech*, 2014 WL 2211612, at *11.

[51] *See* Voting Agreement, App. to Appellant's Opening Br. at A539-621; Share Purchase Agreement, App. to Appellant's Opening Br. at A79-92; Investor Rights Agreement, App. to Appellant's Opening Br. at A221-43; Co-Sale Agreement, App. to Appellant's Opening Br. at A301-09.

*per capita* structure had been intended to prevent Gorman from dominating Westech and the Board, then there would need to be mechanisms designed to prevent a majority stockholder from transferring his or her shares to other persons and entities until the *per capita* votes tipped in the majority stockholder's favor.[52] Absent such mechanisms designed to prevent circumvention of a *per capita* scheme, Gorman argues, the Management Group's interpretation would render Section 1.2(b) ineffective.

### 3. Court of Chancery's Findings

The Court of Chancery concluded that Section 1.2(b) was ambiguous. Contractual ambiguity exists "'[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.' Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'"[53] While the Court of Chancery indicated that the plain language of Section 1.2(b) suggested a *per capita* construction, it determined that Section 1.2(b) was ambiguous, based largely on the "broader arguments about the agreement's structure and intent."[54]

---

[52] Appellants argue that Section 7.17 of the voting agreement is such a mechanism and prevents Gorman from circumventing the *per capita* voting scheme set forth in Section 1.2(b). *See* discussion *infra*.

[53] *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[54] *Westech*, 2014 WL 2211612, at *15.

In particular, the Court of Chancery found Gorman's theory regarding Section 7.17 to be more persuasive.[55] The Court noted that the drafters would likely have wanted to avoid creating a structure that invited "deadlock." It observed that a more effective system of checks and balances could have been adopted, or that the drafters could have more clearly stated their intent if they believed that the threat of "deadlock" was the best way to ensure compromise.[56]

*4. The Plain Language and Structure of the Voting Agreement*

As we recently stated in *ev3 v. Lesh*, "[w]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[57] Our focus on the actual language agreed to and used by the parties to a contract best promotes "parties' ability to negotiate and shape commercial agreements," in keeping with the goal of Delaware law to "ensure freedom of contract and promote clarity in the law [and thus] facilitate commerce."[58]

---

[55] *Id.* at *11.

[56] *Id.*

[57] *ev3 v. Lesh*, 2014 WL 4914905, at *2, n. 3 (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006)).

[58] *Id*.

However, we have also said that we apply a presumption against disenfranchising the majority stockholder, absent a clear intent by the parties to a contract to do so.  For example, the Court of Chancery stated in *Rohe v. Reliance Training Network, Inc.*, "although Delaware law provides stockholders with a great deal of flexibility to enter into voting agreements, our courts rightly hesitate to construe a contract as disabling a majority of a corporate electorate from changing the board of directors unless that reading of the contract is certain and unambiguous."[59]

The Court of Chancery in *Rohe* relied on an earlier case, *Rainbow Navigation, Inc. v. Yonge*, where the Court of Chancery observed, "[i]t is enough to note that an agreement, if it is to be given such an effect [which deprived a majority of shareholders of power to elect directors at an annual meeting or through written consent], must quite clearly intend to have it.  A court ought not to resolve doubts in favor of disenfranchisement."[60]

But the application of that principle depends on the type of contract at issue. When the contract to be interpreted is something like a certificate of incorporation, the presumption against disenfranchising majority stockholders will typically apply if the certificate is not clear on its face, as investors ought to be able to rely on the

---

[59] *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at \*16 (Del. Ch. Jul. 21, 2000).

[60] *Rainbow Navigation, Inc. v. Yonge*, 15 Del. J. Corp. L. 196, 204, 1989 WL 40805 (1989).

express terms of the certificate and have doubts resolved in favor of their ability to act by majority vote. In the case of a contract that was the subject of negotiation, like the Voting Agreement at issue in this case, the presumption applies differently.[61] In that case, if the agreement is ambiguous on its face, the trial court may consider parol evidence to clarify the ambiguity. After doing so, if the trial court finds by clear and convincing evidence that the contract was intended to restrict the normal default rule that a majority of the relevant shares can elect a board member, it can rule for the party arguing for the restriction. When, however, the parol evidence does not rise to that level and leaves the trial court without the requisite level of certainty, the presumption against disenfranchisement requires reading the contract consistent with the default rule.

As the Court of Chancery noted in *Harrah's Entertainment, Inc. v. JCC Holding Co.*, another case involving the interpretation of corporate instruments involving stockholder voting rights:

---

[61] *See, e.g.*, *Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294 (Del. Ch. 2002); *KFC Nat. Council and Advertising Co-op., Inc. v. KFC Corp.*, 2011 WL 350415, at *2 (Del. Ch. Jan. 31, 2011) ("Although I have considered the parol evidence in this case because the NCAC Certificate was the product of specific, arm's length bargaining, the interpretative principle disfavoring disenfranchisement has residual relevance. Unless the parol evidence clearly and convincingly supports the disenfranchising reading, the court should avoid giving effect to such a reading. To do otherwise would defeat the reasonable expectations of the corporation's electorate, which should not face disenfranchisement in a situation where the certificate can reasonably be read either way and where the bargaining and performance history do not clearly and convincingly deny the electorate, or in this case, the electorate's governing board, the authority to decide the matter.").

When a sophisticated party like Harrah's has negotiated the provisions of corporate instruments for several months, it should fairly expect to have those provisions interpreted in the traditional manner, which permits recourse to extrinsic evidence in the event of ambiguity. It would provide a windfall for a party like Harrah's, if it could defeat the reasonable expectations of their negotiating adversaries, simply by convincing the court that the contract is susceptible to more than one interpretation. Why should it get to escape the consequences of a negotiating history that it helped to shape? . . . By permitting the court to consider the parol evidence regarding a negotiated corporate instrument, this approach advances the central aim of contract interpretation, which is to "preserve to the extent feasible the expectations that form the basis of a contractual relationship."[62]

The Court of Chancery acknowledged the risk of disenfranchising stockholders, but clarified how a presumption against disenfranchisement operates in situations like these, where sophisticated parties have negotiated a bilateral agreement:

At the same time, of course, it is important to give substantial weight to the important public policy interest against disenfranchisement. But this interest can be sufficiently furthered by requiring any restriction impinging upon fundamental electoral rights to be manifested in clear and convincing evidence. So long as this sort of clarity is required, there is less danger that an erroneous and therefore inequitable deprivation of core electoral rights will occur.[63]

Here, in examining the language of Section 1.2(b) of the Voting Agreement, several aspects of the structure of the Voting Agreement suggest that a *per capita* scheme was intended -- making this aspect of the case particularly close. For

---

[62] *Harrah's Entm't, Inc.*, 802 A.2d at 311-313 (quoting *Eagle Indus. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997)).

[63] *Id*. at 313.

example, the plain language of the contract suggests that the independent director referenced in Section 1.2(b) is designated by a majority of the individual holders of the preferred stock. Section 1.2(b) reads: "(b) One person who is an Independent Director and is designated by the *majority of the holders* of the Series A Preferred Stock (together with the Pallotta Designee, the 'Series A Designees')."[64] The Court of Chancery stated that "[a] plain reading by a reasonable third party that inquires no further would support Defendants' *per capita* voting theory."[65] The Management Group argues that the analysis should have ended there and that the Court erred in examining extrinsic evidence.

But because this contract was negotiated by two sophisticated parties, the Court of Chancery properly considered the expectations of both parties in forming the contract. Thus, in attempting to discern the meaning of Section 1.2(b), the trial court properly considered not only the language of the provision itself, but also the context of this provision within the overall framework of the Voting Agreement. The trial court considered the purpose of the Voting Agreement, as evidenced by its text, as well as other provisions relating to the removal of directors and provisions relating to the aggregation of shares.

---

[64] Voting Agreement § 1.2(b), App. to Appellant's Opening Br. at A540 (emphasis added).
[65] *Westech*, 2014 WL 2211612, at *15.

With respect to the purpose of the Voting Agreement, the "Recitals" to the

Voting Agreement offer at least some insight. For example, the first Recital states:

> A. Concurrently with the execution of this Agreement, the Company and the Investors are entering into a Series A Preferred Stock Purchase Agreement (the "Purchase Agreement") providing for the sale of shares of the Company's Series A Preferred Stock, and in connection with that agreement *the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company (the "Board") in accordance with the terms of this Agreement.*[66]

Arguably, the explicit purpose of the Voting Agreement -- "provid[ing] *the*

*Investors* with the right . . . to designate the election of certain members of the

board of directors of the Company"[67] -- would be frustrated if only one investor,

Gorman, could control the board seat. That is particularly true because the seat

referenced in Section 1.2(b) is the only one that the investors other than Pallotta,

Gorman, Halder, and Fellus can control: Pallotta (and now Gorman as his

successor) has the right to nominate the Pallotta Designee under Section 1.2(a); the

three Key Holders (Gorman, Halder and Fellus) control the Key Holder Designees

under Section 1.2(c); the CEO is designated to sit on the Board under Section

1.2(d); and the two independent director seats under Section 1.2(e) are filled by a

vote of the Series A Designees and the Key Holder Designees. If Gorman's

---

[66] Voting Agreement Recitals, App. to Appellant's Opening Br. at A539 (emphasis added).

[67] *Id.* (emphasis added).

interpretation were correct, the approximately 25 other signatories to the Voting Agreement would lack representation on the Board.

Yet the Court of Chancery expressed concern that interpreting Section 1.2(b) to provide for a *per capita* scheme could lead to an absurd result: Gorman (or any other investor) could simply create multiple investment vehicles so that he controlled multiple "holders" for purposes of reaching a majority *per capita* vote. The Management Group responded that Section 7.17 was intended to prevent precisely that kind of circumvention: by providing for the aggregation of shares, Section 7.17 requires "all shares held or acquired by an investor and/or its affiliates" to be "aggregated together for the purposes of determining the availability of any rights under this agreement."[68]

In response, Gorman argues that shares cannot simultaneously be aggregated to form one "holder" for the purposes of a *per capita* scheme, and then have the rights be separately apportioned.[69] Gorman argues further that this provision was intended to meet threshold requirements for board composition under Section 1.2,

---

[68] Voting Agreement § 7.17, App. to Appellant's Opening Br. at A550.

[69] Section 7.17 also includes a clause stating, "such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate." *Id.*

33

for drag-along rights under Section 4.2, and for amendment, termination or waiver under Section 7.8.[70]

The Court of Chancery rejected the Management Group's contentions, apparently because Section 7.17 was unaltered from the provision in the Model Voting Agreement and there was no contemporaneous evidence supporting the Management Group's "new theory in anticipation of trial."[71] Accordingly, the Court of Chancery's view that Section 7.17 was not intended to prevent circumstances of a *per capita* scheme influenced its conclusion that the parties did not intend Section 1.2(b) to be a *per capita* provision.

However, it is certainly plausible that Section 7.17 could have been viewed as sufficient to prevent circumvention of a *per capita* scheme, even though it was derived from a Model Voting Agreement that contemplated a *per share* scheme. At least a reasonable reading of Section 7.17 is that it is sufficient to prevent circumvention of a *per capita* scheme, although it may not have been clearly

---

[70] *See* Voting Agreement § 1.2(a), App. to Appellant's Opening Br. at A540; Voting Agreement § 4.2, App. to Appellant's Opening Br. at A542; Voting Agreement § 7.8, App. to Appellant's Opening Br. at A547-48.

[71] *Westech*, 2014 WL 2211612, at *12. The parties agree that the National Venture Capital Association Model Voting Agreement was the model form used as a template for their Voting Agreement. *See* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1317-42. The Model Voting Agreement does not contemplate *per capita* voting. Section 7.18 of the Model Voting Agreement is almost exactly the same as Section 7.17 of the Voting Agreement. Thus, the Court of Chancery reasoned, any unaltered provisions could not have been intended for use in a *per capita* scheme. *See Westech*, 2014 WL 2211612, at *12 ("Thus, Section 7.17, as drafted in the form agreement, cannot have been written to cause investors' shares to be treated as a single vote for per capita voting purposes because per capita voting is not contemplated in the form agreement.").

modified from the Model Voting Agreement for the purpose the Management Group now contends.

The removal provisions are also relevant in understanding the overall structure of the Voting Agreement. Reference to Section 1.4(a) may suggest that Section 1.2(b) was intended to be a *per share* provision. As discussed further below, Section 1.4(a) provides that removal is permitted when directed or approved by the affirmative vote of the "Person" or "holders of more than fifty percent (50%) of the then outstanding Shares."[72] Because we believe, as more fully explained below, the removal provisions of Section 1.4(a) were intended to match the designation provisions of Section 1.2, a reasonable reading of Section 1.2(b) as providing for a *per capita* scheme would render the "shares" clause as surplusage.[73] In other words, the "Person" clause logically applies to Sections 1.2(a), 1.2(c) and 1.2(e). If it also applied to Section 1.2(b), there would be no need for the "shares" clause in Section 1.4(a). Thus, the only reasonable way to interpret the removal of a Section 1.2(b) designee without rendering a clause under

---

[72] Voting Agreement § 1.4(a), App. to Appellant's Opening Br. at A541.

[73] Section 1.2(a) triggers the "Person" clause because the director is appointed by an individual. Section 1.2(c), as discussed below, also triggers the "Person" clause. Section 1.2(d) has its own removal mechanism because the seat is reserved for the CEO. Section 1.2(d) provides that "if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Company, each of the Stockholders shall promptly vote their respective Shares (i) to remove the former Chief Executive Officer from the Board if such person has not resigned as a member of the Board and (ii) to elect such person's replacement as Chief Executive Officer of the Company as the new CEO Director." Voting Agreement § 1.2(d), App. to Appellant's Opening Br. at A540. Section 1.2(e) also triggers the "Person" clause because the Independent Directors are designated by the Series A Designees and the Key Holder Designees.

Section 1.4(a) surplusage is by interpreting the removal under Section 1.4(a) to be effected by the approval of the holders of more than 50% of the outstanding shares of Series A Preferred Stock. This construction suggests that a *per share* interpretation of Section 1.2(b) is correct.[74]

Given that some aspects of the Voting Agreement suggest a *per capita* view of Section 1.2(b), and others suggest a *per share* view, we agree with the trial court that Section 1.2(b) is ambiguous. Thus, in keeping with the teaching of *Harrah's* the Court of Chancery properly undertook a review of the extrinsic evidence.

### 5. *Extrinsic Evidence*

When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity.[75] The standard for interpreting ambiguous contracts is well settled:

> If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic

---

[74] At oral argument before this Court, the Management Group contended that the "Person" clause in Section 1.4(a) applies to Section 1.2(a), 1.2(b), 1.2(c) and 1.2(e). They attempt to avoid the "surplusage" argument by pointing to the paragraph following Section 1.2(e), which addresses situations in which clauses (a) through (e) in Section 1.2 are not applicable. We believe that this is a less logical and compelling interpretation of the interplay between Section 1.2 and Section 1.4. The Management Group's position at oral argument is also contrary to the position they took before the Court of Chancery. There they argued that, "[u]nder Section 1.4, removal of a director designated under Section 1.2(b) may be effected by any person or persons holding fifty percent or more of the Series A shares." App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1121.

[75] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001).

evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.[76]

The Management Group argues that the Voting Agreement was negotiated to create a triumvirate structure with checks and balances.[77] The purpose of the Voting Agreement, they contend, illustrates that a *per capita* scheme was intended for both Sections 1.2(b) and 1.2(c). Their position is largely supported through affidavits and deposition testimony. The Management Group cites no contemporaneous evidence in their briefs to support their argument.

An examination of the capital infusion may be helpful to understand what the parties intended. Pallotta, who invested $2 million, obtained the right to designate a director under Section 1.2(a), and Fellus, who agreed to invest $1.6 million, was entitled to be designated as a director on the Westech Board under Section 1.2(d) because he was to become the new Westech CEO. Gorman and Halder, who were already Westech board members, were named in the Voting Agreement as the initial Key Holder Designees under Section 1.2(c). Gorman invested $1.8 million. Halder, on behalf of himself and what appears to be his

---

[76] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alternations in original) (citations omitted) (internal quotation marks omitted).

[77] The Key Holders (Halder, Fellus and Gorman) were to constitute the alleged triumvirate. *See* Voting Agreement Schedule B, App. to Appellant's Opening Br. at A619.

children, invested the smallest amount of money among the Key Holders, namely, $225,000. But including all of the other Westech employees who contributed, the total employee share was identical to Pallotta's -- namely, approximately $2 million. The employees, however, were not a "bloc" in the sense that there might not always be one individual who could speak on their collective behalf. Thus, the Management Group argues that Section 1.2(b) provided for a *per capita* scheme to allow these smaller investors a meaningful opportunity to designate a director to the Board.

Further, as noted earlier, a comparison of Section 1.2(c) in the Model Voting Agreement to Section 1.2(b) of the Voting Agreement indicates that "the holders of a majority of the Shares of Common Stock" was changed to "the majority of the holders of the Series A Preferred Stock."[78] This intentional departure from the Model Voting Agreement is perhaps the most compelling evidence that the parties may have contemplated a *per capita* scheme with respect to Section 1.2(b). Thus, a logical inference to be drawn from this fact may be that the parties intended for Section 1.2(b) to be *per capita*, and that any lack of conformity elsewhere in the Voting Agreement is due to sloppy drafting or scrivener's errors.

---

[78] Prior drafts of the Voting Agreement indicate that the language in Section 1.2(b) was not changed significantly after it was initially adopted from the Model Voting Agreement. *See* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B48, B225, B416, B653, B749. In fact, the language in dispute was never modified after its initial adoption from the Model Voting Agreement. The fact that the language was not heavily negotiated and not modified meaningfully in the draft agreements is not dispositive.

Gorman contends that the smaller investors were never intended to have the same voting power as the larger investors. The Court of Chancery found Gorman's view to be more compelling, because the Management Group could not point to any contemporaneous evidence that the smaller investors were intended to have the same voting power as the larger investors. As set forth more fully in the discussion of Section 1.2(c), we believe the Court of Chancery erred in making certain factual findings relevant to this point. However, we agree that the extrinsic evidence is not conclusive either way. Accordingly, while there may be some evidence that a *per capita* scheme was intended in Section 1.2(b), the intent to create such a voting structure does not rise to the level of being sufficiently "clear and convincing."[79]

### 6. Judicial Presumptions

We agree that given the conclusion that Section 1.2(b) is ambiguous after considering the plain meaning and the contemporaneous extrinsic evidence, we apply the judicial presumptions set forth in our case law. As discussed above, *Rohe v. Reliance Training Network, Inc.*[80] and *Rainbow Navigation, Inc. v.*

---

[79] *Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 313 (Del. Ch. 2002). This is despite the fact that it appears that more of the evidence in the record suggests a *per capita* scheme -- as opposed to a *per share* scheme -- under Section 1.2(b) was intended.

[80] 2000 WL 1038190 (Del. Ch. Jul. 21, 2000).

*Yonge*[81] establish judicial presumptions that assist in interpreting contractual language in voting agreements.

In *Rainbow Navigation*, the Court of Chancery stated:

A shareholders agreement that is said to have the effect of depriving a majority of shareholders of power to elect directors at an annual meeting, or preventing such shareholders from exercising the power conferred by Section 228 to act in lieu of a meeting, is an unusual and potent document. . . . It is enough to note that an agreement, if it is to be given such an effect, must quite clearly intend to have it. A court ought not to resolve doubts in favor of disenfranchisement.[82]

As noted, these presumptions apply differently depending on the type of contract at issue. In this case, there is some evidence to suggest that the parties intended for Section 1.2(b) to create a *per capita* scheme to designate Board nominees, but the Court of Chancery did not find that the evidence was sufficiently "clear and convincing" to overcome the presumption against disenfranchisement. Although if we were the trial judge in the first instance, we may have interpreted the contract differently because there was room to find that the parol evidence reflected the parties' intention to apply a *per capita* scheme consistently across the entire Voting Agreement, we defer to the Court of Chancery's reasoned determination that there was evidence supporting a contrary outcome as to Section 1.2(b) and to therefore rule as it did. Accordingly, we affirm the Court of

---

[81] 15 Del. J. Corp. L. 196, 1989 WL 40805 (Del. Ch. Apr. 24, 1989).

[82] *Rainbow Navigation*, 15 Del. J. Corp. L. at 204, 1989 WL 40805 (citing *Williams v. Sterling Oil of Oklahoma*, 273 A.2d 264 (Del. 1971)).

Chancery's conclusion that Section 1.2(b) provides for a *per share* scheme. In consequence, Gorman as the majority stockholder was entitled to designate his own candidate. Ford was thus validly designated and elected to the seat.

### C.     Section 1.2(c) is a Per Capita Provision

#### 1. The Management Group's Contentions

The Management Group argues that Section 1.2(c) is unambiguous in providing for a *per capita* scheme to designate Board nominees. They argue that where the Voting Agreement intended the vote to be based on shares, language referring to shares was used.[83] Conversely, where language of shares was omitted, as here, a *per capita* scheme was intended.

The Management Group also contends that at the time the Voting Agreement was executed, Gorman "had more shares of capital stock than Halder and Fellus combined. . . ."[84] Thus, a *per share* scheme under Section 1.2(c) would necessarily mean that Gorman, by virtue of his majority stockholder status among the Key Holders, has unilateral authority to "elect" the Key Holder Designees. As a result, the Key Holder structure would have been rendered meaningless at the time the Voting Agreement was signed. If such a result were intended, they argue,

---

[83] *See* footnote 46, *supra*.

[84] Appellant's Opening Br. at 29.

the Voting Agreement would have provided for a "Gorman Designee," similar to one provided for Pallotta in Section 1.2(a).

## 2. *Gorman's Contentions*

Gorman argues that Section 1.2(c) is ambiguous. He argues that where there is ambiguity, courts must apply gap-fillers in favor of majority voting.[85] He contends that the Series A Certificate of Designation provides for a *per share* scheme, and that the Management Group's interpretation conflicts with the Certificate of Designation.[86]

Gorman further contends that the Management Group's "Gorman designee" argument ignores contemporaneous evidence that the parties intended the Key Holders to be substantial investors, as was the case in all drafts of the Voting Agreement "until Halder inexplicably replaced Pallotta as a Key Holder in the

---

[85] *See Standard Power & Light Corp. v. Inv. Assocs., Inc.*, 51 A.2d 572, 576 (Del. 1947) ("Outstanding among the democratic processes concerning corporate elections is the general rule that a majority of the votes cast at a stockholders' meeting, provided a quorum is present, is sufficient to elect Directors . . . If this rule is not to be observed, then the charter provision must not be couched in ambiguous language, rather the language employed must be positive, explicit, clear and readily understandable and susceptible [*sic*] to but one reasonable interpretation, which would indicate beyond doubt that the rule was intended to be abrogated.").

[86] Section 5.1 of the Series A Certificate of Designation provides that, "[o]n any matter presented to the stockholders of the Corporation for their actions or consideration at any meeting of stockholders of this Corporation (or by written consent of stockholders in lieu of a meeting), each holder of outstanding shares of Series A Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Series A Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter." App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B1167.

execution version."[87] Had Halder not "inexplicably" replaced the original Key

Holders (who Gorman contends were Pallotta, Fellus, and himself), a *per share*

reading of Section 1.2(c) would not convert it into a Gorman designee provision, as

the Management Group contends.

Gorman further argues that while he would have controlled the election of

Key Holder Designees when the Voting Agreement was executed, nothing

prevented Halder and/or Fellus from acquiring more shares and utilizing Section

1.2(c) as a protective mechanism for their own investment. Because nothing

prevented Gorman from selling some of his own stock, and the other Key Holders

from purchasing stock, the other Key Holders could eventually choose to dilute

Gorman's control over the Key Holder Designees. Each Key Holder has the same

opportunity to acquire sufficient voting power to designate a director nominee.

Gorman also argues that the removal provisions under Section 1.4 support

his interpretation of 1.2(c). Gorman argues that Section 1.4 contemplates

removing directors by a *per share* vote, and therefore, Section 1.2(c) should be

interpreted the same way.[88] Otherwise, directors could be designated by the

---

[87] Appellee's Answering Br. and Cross-Appellant's Opening Br. at 34.

[88] The Management Group responds that the removal of a director designated under a *per capita* voting scheme triggers the "Person" clause, where only the holders who designated the director may remove that director by a *per capita* vote. They argue that the "holders of more than fifty percent" clause is not triggered when a director is designated under a *per capita* voting scheme. Instead, the "holders of more than fifty percent" clause is triggered only when there is a *per share* voting scheme to designate the director. According to the Management Group, Section 1.2(b) and 1.2(c) require *per capita* voting. If that is true, none of the subsections (a) through (e)

43

majority of the individual Key Holders, but then removed by the majority of shares, likely creating the threat of "deadlock." Gorman claims that promoting such a potentially never-ending cycle of designations and removals was not intended.

Finally, Gorman asserts on cross-appeal that the Management Group's interpretation of a *per capita* scheme would run afoul of Section 212(a) of the DGCL.[89] Under a *per share* scheme, each Key Holder exercises one vote per share. Thus, Gorman does not have any greater or any less voting power per share than any other Key Holder. However, under a *per capita* scheme, according to Gorman, Key Holders with fewer shares have greater voting power per share than Key Holders who own more shares, because each Key Holder may only cast one vote, regardless of the number of shares he or she owns. But Gorman acknowledges that the Voting Agreement provides for a two-step election process -- action by a subset of stockholders to designate a director, followed by a vote of all stockholders to elect the director[90] -- yet argues that the designation step must

---

under Section 1.2 would require *per share* voting. Thus, as noted above, the Management Group argues that the "majority of shares" clause in Section 1.4(a) is relevant only when subsections (a) through (e) in Section 1.2 do not apply.

[89] 8 *Del. C.* § 212(a).

[90] The Series A Preferred Stockholders must vote their shares in favor of the director designated by the subset of stockholders identified in the Voting Agreement. *See* Voting Agreement § 1.2(b), App. to Appellant's Opening Br. at A540.

comply with Section 212(a) of the DGCL, and therefore, must be interpreted as providing for a *per share* scheme.

### 3. Court of Chancery's Findings

The Court of Chancery concluded, based on the plain language and structure of the Voting Agreement, that Section 1.2(c) provides for a *per capita* scheme. The Court found the Management Group's arguments persuasive -- that interpreting Section 1.2(c) to provide for a *per share* scheme would convert the Key Holder Designee into a "Gorman Designee" provision and would "read [the Key Holders] out of existence."[91]  The Court also noted that three natural persons were listed in Schedule B of the Voting Agreement as Key Holders without any reference to the amount of Westech stock they held.  The Court acknowledged that the removal provision under Section 1.4 -- which the Court interpreted as removal by a majority of the shares -- would invite "deadlock."  But the Court held that "[o]ne could conclude that the removal provisions are part of a scheme of checks and balances."[92]

### 4. The Plain Language and Structure of the Voting Agreement

Section 1.2(c) provides for "two persons *elected by the Key Holders*, who shall initially be John J. Gorman IV and Robert W. Halder (the 'Key Holder

---

[91] *Westech*, 2014 WL 2211612, at *16.

[92] *Id.*  The Court of Chancery also acknowledged the possible conclusion that "the agreement's drafters wrote Section 1.2(c) to function as a majority of shares voting provision to mirror the agreement's removal provisions."  *Id.*

Designees').")[93]  Schedule B of the Agreement lists the Key Holders as Gorman, Halder, and Fellus.[94]  The plain terms of Section 1.2(c) allow these three holders to designate two persons for election to the Board.

We agree with the Court of Chancery that reading Section 1.2(c) as providing for a *per share* scheme would read the Key Holders specified in Schedule B out of existence.  Because Gorman was the majority stockholder at all relevant times compared to the other named Key Holders, if the directors under Section 1.2(c) could be designated by a *per share* vote, the directors would automatically be the "Gorman Designees," much as the "Pallotta Designee" was specifically named in Section 1.2(a).  By contrast, the two designees under Section 1.2(c) are named as "Key Holder Designees," and Gorman was only one of the three Key Holders.  To give effect to the clear specification of two other Key Holders, we read Section 1.2(c) to provide for a *per capita* scheme.

*The Removal Provisions of Section 1.4 of the Voting Agreement Were Intended to Match the Designation Provisions*

The relevant removal provision under Section 1.4(a) provides:

(a) no director elected pursuant to Sections 1.2 or 1.3 of this Agreement may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person, or of the holders of more than fifty percent (50%) of the then outstanding Shares entitled under Section 1.2 to designate that director or (ii) the

---

[93] Voting Agreement § 1.2(c), App. to Appellant's Opening Br. at A540 (emphasis added).

[94] Voting Agreement Schedule B, App. to Appellant's Opening Br. at A619.

Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to Section 1.2 is no longer entitled to designate or approve such director or occupy such Board seat. . . ."[95]

Section 1.4(c) also provides that "upon the request of any party entitled to designate a director as provided in Section 1.2(a), 1.2(b) or 1.2(c) to remove such director, such director shall be removed."[96]

Unlike Section 1.2(b), the Key Holder Designee provision in Section 1.2(c) does not refer to "holders of the Series A Preferred Stock." Rather, like Section 1.2(a), it refers to persons, *i.e.*, the three designated Key Holders. Further, the Voting Agreement does not require that any of the Key Holders must own stock.[97] In a scenario where all the Key Holders were to sell their shares, interpreting Section 1.4(a) as providing for a *per share* removal of directors designated under Section 1.2(c) may lead to the illogical consequence of a director designated under Section 1.2(c) who is not removable under Section 1.4. The absence of stock ownership as a requirement to be a Key Holder suggests that persons voting *per capita*, not *per share*, must be able to remove the director.

---

[95] Voting Agreement § 1.4(a), App. to Appellant's Opening Br. at A541.

[96] Voting Agreement § 1.4(c), App. to Appellant's Opening Br. at A541.

[97] The parties initially included a column where the number of shares held by the Key Holder would be specified. However, that column was removed in the final draft of the Voting Agreement. *Compare* App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B255 *with* App. to Appellant's Opening Br. at A619.

As a result, we believe that the only reasonable reading of the Voting Agreement is that the designation provisions and removal provisions were intended to be symmetrical. Thus, we read the first provision of Section 1.4(a), removal by the "affirmative vote of the Person," as providing the applicable removal process for directors designated under Section 1.2(c). Only those persons eligible to designate the Key Holder Designees can remove them. Although the parties could have been clearer, particularly by appending "(s)" to "Person" as they did later in the same sentence, they appear to have lifted the text from the Model Voting Agreement without making that minor modification.

Accordingly, the parties disputed whether Gorman had the unilateral power to remove Halder from the Board. The Court of Chancery found that he did under Section 1.4. However, based on the foregoing, we find the language of Section 1.4(a) is clear and unambiguous, and conclude that Gorman was not entitled to remove Halder as a Key Holder Designee from the Board.

### 5. Extrinsic Evidence

Despite finding that Section 1.2(c)'s plain language and the overall structure of the Voting Agreement indicated that a *per capita* scheme was intended, the Court of Chancery undertook an analysis of the extrinsic evidence. The Court found that the evidence "was generally not supportive of [the Management

48

Group's] triumvirate theory, although it also does not provide definitive proof that Gorman's account of the negotiations is correct."[98]

The Court of Chancery focused on an email sent by Westech's counsel in the summer of 2011 (the "2011 email"). In the 2011 email, counsel discussed blanks in the Voting Agreement and indicated, "[w]e are contemplating including Fellus, Gorman, Pallotta (and perhaps Ira Lampert and any other *significant investor* from the Pallotta group as the Key Holders). In Gorman's group, the next biggest investor is at $250,000."[99] Based on its interpretation of the extrinsic evidence, including the 2011 email, the Court noted that the "the drafters were apparently concerned with providing representation for significant investors, but demonstrated no particular consideration for the employee investors."[100] The Court of Chancery further noted that the 2011 email "appears to focus on two 'camps' -- a Gorman camp and a Pallotta camp" and "Halder was not mentioned."[101] However, it appears that the Court of Chancery misinterpreted two aspects regarding the 2011 email. First, the Court misinterpreted the use of the term "group." Second, the Court misinterpreted the role of the employees in the overall structure. We review these factual findings for clear error.

---

[98] *Westech*, 2014 WL 2211612, at *17.

[99] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B411 (emphasis added).

[100] *Westech*, 2014 WL 2211612, at *13.

[101] *Id.*

*Misinterpretation of "Groups"*

First, the Court of Chancery misinterpreted the use of the term "group," at least as it relates to Gorman and Fellus. The 2011 email explicitly refers to groups of Gorman and Fellus' family members and affiliates.[102] Both Gorman and Fellus purchased shares through a number of other family members and affiliated accounts, and the dollar amount of these purchases supports a reading of the term "group" in the email as referring to these affiliated purchasers.[103]

The 2011 email references a "Pallotta group," but there is no evidence, contemporaneous or after-the-fact, to explain what the "Pallotta group" means in that context. The 2011 email suggest that Ira Lampert ("Lampert") may be a member of Pallotta's "group," but Lampert apparently never purchased any of Westech's Series A Preferred Stock, at least not under his own name.[104] There was no testimony by Pallotta or Monaco that Pallotta was affiliated with or brought in any other investors. Instead, the parties have repeatedly described Pallotta as

---

[102] For example, the parties also used the term "groups" in the following context: "The definition of 'Affiliate' has been updated to contemplate investors who purchase through a trust, IRA, 401K, or their immediate family *to accommodate many of the actual investors in the Gorman and Fellus groups*." App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B411 (emphasis added).

[103] For example, the email mentions that the "next biggest investor" in Gorman's group "is at $250,000." App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B411. Gorman's biggest single investments are both of $700,000 as Custodian for his Roth IRA Rollover #691-90307 and as Custodian for Ryleigh H. Gorman's Roth IRA Rollover #691-90308, but his next biggest investment is of $250,000, as Custodian for Roth IRA #2 #691-90319. *See* App. to Appellant's Opening Br. at A612.

[104] *See* App. to Appellant's Opening Br. at A612-17.

investing $2 million, which matches the amount listed under his own name on the Schedule of Purchasers attached to the Voting Agreement.[105]  If Pallotta intended to attract other investors to the deal, nothing in the record indicates that he actually did so.

Further, Pallotta's own deposition testimony undermines the Court of Chancery's interpretation that the purpose of the Voting Agreement was to protect the interests of the two significant investors, Pallotta and Gorman.  Pallotta testified that he never contemplated serving as a Key Holder, nor was he aware if Monaco, who negotiated the Voting Agreement on his behalf, ever contemplated having him serve as one.[106]  Pallotta's actions also were not consistent with those of someone who was sincerely worried about being represented on the Board:  he did not designate Monaco to fill his seat until March 2012, five months after the Series A Preferred Stock offering closed.[107]

---

[105] App. to Appellant's Opening Br. at A612.

[106] App. to Appellant's Opening Br. at A975.

[107] According to Monaco's deposition testimony, the delay was caused by Pallotta's fear of over-committing Monaco, and Pallotta's apparent belief that he did not need immediate representation on Westech's board because he trusted Westech's management.  According to Monaco's testimony, he (and thereby Pallotta) did not feel the need to control any additional board seats as a Key Holder:  "I believed [Pallotta's] interests were adequately protected, because he had a board seat, Rob Halder had a board seat, John Gorman, who was a friends of ours and who we trusted implicitly, and who I always thought would look after [Pallotta's] interest, had a board seat. . . ."  App. to Appellant's Opening Br. at A1073.

*Misinterpretation Regarding Employee Representation*

Second, the Court of Chancery also failed to accurately assess Halder's role based upon the overall structure and on what little contemporaneous evidence there is of the negotiating history. The employees -- including Halder -- and their families together put up the same amount as Pallotta, and more than Fellus and Gorman. This suggests that a more reasonable interpretation of the Voting Agreement is that it was intended to provide each of the four relevant investor groups with board representation. Pallotta was given board representation under Section 1.2(a); Gorman, as the majority stockholder obtained meaningful board representation under Section 1.2(b)'s *per share* scheme; and the employees, represented by Halder, obtained meaningful board representation under Section 1.2(c)'s *per capita* scheme. Thus, Section 1.2(c) equally represented the interests of Gorman, the majority stockholder; Fellus, the consultant and post-transaction CEO; and Halder, the representative of the Westech employees. Such a reading is consistent with the Voting Agreement's stated purpose, namely, "to provide the *Investors* with the right, among other rights, to designate the election of certain members of the board of directors of the Company."[108] Thus, the Court of Chancery erroneously believed that certain extrinsic evidence cut against, or simply did not speak to, the Management Group's "triumvirate" structure.

---

[108] Voting Agreement Recitals, App. to Appellant's Opening Br. at A539 (emphasis added).

Further, the Court of Chancery erroneously concluded that Halder did not appear in the relevant documents until late in the process. The record reflects that Halder was intimately involved in the Voting Agreement negotiations from the beginning. He is included on every email contained in the record sent by the attorneys involved in drafting the Voting Agreement.[109] Halder was listed as one of the two Key Holder Designees for the Westech Board in a draft Voting Agreement dated March 21, 2011, the earliest version of the Voting Agreement included in the record.[110] Indeed, this provision of the Voting Agreement remained unaltered in every version of the draft throughout the parties' negotiations.[111] The actual list of Key Holders attached to the Voting Agreement remained blank as late as the "Execution Version" circulated on July 21, 2011.[112]

But in the April 5 draft of the Co-Sale Agreement that was part of the same set of documents for the Series A Preferred Stock transaction as the Voting Agreement -- and consistent with Halder's inclusion as a Key Holder Designee in the draft version of Section 1.2(b) of the Voting Agreement itself -- Halder was

---

[109] *See, e.g.*, App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B42, B66, B198, B410.

[110] *See, e.g.*, App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B48.

[111] *See, e.g.*, App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B225, B749.

[112] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B764.

listed as one of three Key Holders.[113]  Contrary to the Court of Chancery's view of Halder replacing Pallotta late in the game as a Key Holder, Pallotta's name did not replace Halder's until June 28, in a version of the Co-Sale Agreement that clearly indicates that it is not final.[114]  Even in that iteration of the documents, Halder is still listed as one of the two Key Holder Designees in the Voting Agreement,[115] and the Voting Agreement's list of Key Holders in Schedule B is blank.[116]  The Court of Chancery's perception of Halder as becoming a Key Holder at the last-minute is therefore not supported by the record.

Further, Monaco's deposition testimony endorses the Management Group's theory about a triumvirate of Gorman, Halder, and Fellus.[117]  Monaco asserted that the Voting Agreement:

> was drafted in some respects to protect each of the individuals, to make sure that no one of the three could become dictatorial with respect to the other two. . . .  I believe the intent, and it certainly was my intent, [was] that no one person be allowed to control the Board of Directors.  That's good governance.[118]

---

[113] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B253, B255. Accordingly, the final version of Schedule B to the Co-Sale Agreement listing the Key Holders matches Schedule B of the Voting Agreement.  App. to Appellant's Opening Br. at A369, A452.

[114] After Pallotta's name, there are brackets around "others or other entities through which investments are being made?"  App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B470.

[115] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B416.

[116] App. to Appellee's Answering Br. and Cross-Appellant's Opening Br. at B431.

[117] App. to Appellant's Opening Br. at A1010.

[118] App. to Appellant's Opening Br. at A1024.

54

Similarly, Fellus recalled during his deposition that the purpose of the Voting Agreement was to "guarantee that John Gorman no longer had control"[119] by creating a "partnership" with Halder and Gorman.[120]

Thus, the Court of Chancery erred in certain of its factual findings, namely, the role of Halder in the structure, and its interpretation of the 2011 email. These errors, however, do not undermine the Court of Chancery's ultimate conclusion -- which we affirm -- that Section 1.2(c) provides for a *per capita* designation of the Key Holder Designees.

### 6. There is No Violation of Section 212(a)

Gorman argues on cross-appeal that a *per capita* interpretation of Section 1.2(c) would violate 8 *Del. C.* § 212(a).[121] Appellants argue that a *per capita* designation under the Voting Agreement does not violate Section 212(a) because the Voting Agreement acts as a contractual overlay pursuant to 8 *Del. C.* § 218(c).

Although Section 212(a) sets forth the "one share/one vote" default rule, Section 212(a) does not prohibit stockholders from agreeing upon the manner in which such shares will be voted. For example, Section 218(c) provides:

---

[119] App. to Appellant's Opening Br. at A660.

[120] App. to Appellant's Opening Br. at A696. The Court of Chancery discounted these accounts as "after-the-fact testimony from interested individuals." *Westech*, 2014 WL 2211612, at *13. However, Monaco has no apparent stake in the trial or the company, and Fellus owes over $1 million to Westech under the Voting Agreement.

[121] 8 *Del. C.* § 212(a).

An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.[122]

The Voting Agreement established a two-step process in connection with the nomination and election of directors. The nominees are designated in the first step according to the Voting Agreement (which is permitted under Section 218(c)). Then, the nominees are elected in the second step consistent with the "one share/one vote" default rule under Section 212(a).

Gorman argues that although the election process mandated by the Voting Agreement comports with Section 212(a), the nomination process violates Section 212(a). Yet, to adopt Gorman's argument would require us to ignore the distinction between the nomination process and the election process established in the Voting Agreement. Gorman vigorously contends that Section 212(a) applies to the nomination step of the Westech election process "because the Nomination Step requires a stockholder vote."[123] He contends that Sections 1.2(b) and 1.2(c) involve three or more stockholders to "elect" or "designate" the director nominee for whom Westech stockholders must vote.[124] He argues that the process of

---

[122] 8 *Del. C.* § 218(c).

[123] Cross-Appellant's Reply Br. at 4.

[124] Gorman points to the language in Section 1.2(c) referring to "two persons *elected* by the Key Holders" to suggest that the nomination process is also an "election" of directors. *See* Voting Agreement § 1.2(c), App. to Appellant's Opening Br. at A540 (emphasis added). However, the

56

"electing" or "designating" in the nomination step requires stockholder action either by voting or by written consent -- either of which is subject to Section 212(a).[125]

We disagree and conclude that the Voting Agreement does not provide for *per capita* voting in connection with the designation of nominees to the Board. Rather, it provides for a *per capita* scheme (a majority vote of the Key Holders) for

---

parenthetical in Section 1.2(c) refers to "(the 'Key Holder Designees')." *Id.* Thus, the "election" language is better viewed as sloppy drafting.

[125] Gorman cites *Harrah's Entm't Inc. v. JCC Holding Co.*, 802 A.2d 294 (Del. Ch. 2002), for the proposition that the nomination process is a critical part of the stockholders' right to vote. However, *Harrah's* is inapposite. In that case, Harrah's controlled three of JCC Holding's board seats and JCC Holding's noteholders controlled the other four board seats on JCC Holding's seven-member classified initial post-reorganization board. JCC Holding's certificate of incorporation stated that Harrah's and the noteholder directors each had the "right" to nominate one director at the first annual meeting following JCC Holding's emergence from bankruptcy reorganization. Harrah's nominated two directors and contended that its "right" to nominate one director did not preclude it from nominating additional directors. The Court of Chancery agreed, concluding that "the rule of construction in favor of franchise rights is implicated by a purported limitation on the ability of a stockholder -- particularly one owning 49% of the common stock -- to nominate sufficient candidates to elect a new board majority tilting its way." *Id.* at 310. The Court then observed that "[b]ecause of the obvious importance of the nomination right in our system of corporate governance, Delaware courts have been reluctant to approve measures that impede the ability of stockholders to nominate candidates." *Id.* It also commented that "Delaware law recognizes that the 'right of shareholders to participate in the voting process includes the right to nominate an opposing slate.'" *Id.* There the Court was concerned about a restriction on electoral rights. The issue here is whether the nomination process runs afoul of Section 212(a)'s "one share/one vote" rule. *Harrah's* does not address this issue. If the Voting Agreement provided for "scaled voting" in connection with the *election* of nominees without an authorizing provision in the certificate of incorporation, then that would present a conflict with Section 212(a). *See Providence & Worcester Co. v. Baker*, 378 A.2d 121, 123 (Del. 1977) ("Under [§] 212(a), voting rights of stockholders may be varied from the 'one share-one vote' standard by the certificate of incorporation."). Scaled voting refers to a modification of the "one share/one vote" rule. For example, in *Baker*, the certificate of incorporation provided for one vote per share for the first fifty shares, but only one additional vote for every twenty shares thereafter. *See Baker v. Providence & Worcester Co.*, 364 A.2d 838, 840 (Del. Ch. 1976). But the Voting Agreement does not change how votes are counted in elections. Instead, it binds the signatories to cast the votes they possess in accordance with its terms.

the designation of two nominees under Section 1.2(c).[126]  These nominees are then elected to the Board by a vote of the stockholders consistent with the "one share/one vote" default rule and Westech's Restated Certificate of Incorporation. Accordingly, we affirm the Court of Chancery's conclusion that the Voting Agreement does not violate Section 212(a) of the DGCL.

### D.    Other Conclusions

Finally, we conclude that after resigning from the Board, Gorman did not have the authority to remove Dura as an independent director, because Section 1.4(a)'s removal provision corresponds to the designation provision in Section 1.2(e), requiring agreement and joint action by the Series A Designees and the Key Holder Designees, which did not occur.  Further, because of our analysis of Section 1.2(b), we affirm the Court of Chancery's conclusions that Ford was validly elected at the 2013 Annual Meeting as a Series A Designee.  Thus, we hold that the composition of the Westech Board is as follows:

| §1.2(a) Pallotta | §1.2(b) Series A | §1.2(c) Key 1 | §1.2(c) Key 2 | §1.2(d) CEO | §1.2(e) Ind. 1 | §1.2(e) Ind. 2 |
|---|---|---|---|---|---|---|
| Gorman | Ford | Halder | [Vacant] | Salamone | Dura | [Vacant] |

### III. CONCLUSION

Based upon the foregoing, the Judgment of the Court of Chancery is **AFFIRMED** in part and **REVERSED** in part.

---

[126] *See, e.g., Levitt Corp. v. Office Depot, Inc.*, 2008 WL 1724244, at *6 (Del. Ch. Apr. 14, 2008) ("[N]ominating candidates and voting for preferred candidates are separate steps.").