# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALLTRISTA PLASTICS, LLC d/b/a JARDEN PLASTIC SOLUTIONS | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N12C-09-094 JRJ CCLD |
| ROCKLINE INDUSTRIES, INC., | ) ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: February 5, 2016
Date Decided: March 11, 2016

*Upon Plaintiff's Motion for Summary Judgment*: **DENIED.**

Joseph A. Bellew, Esquire, Cozen O'Connor, Wilmington, DE, James H. Heller, Esquire (*pro hac vice*) (argued), Abby L. Sacunas, Esquire (*pro hac vice*), Cozen O'Connor, Philadelphia, PA, Attorneys for Plaintiff Alltrista Plastics, LLC d/b/a Jarden Plastic Solutions.

Daniel J. Brown, Esquire, James J. Freebery, Esquire, McCarter & English, LLP, Wilmington, DE, Jessica H. Polakowski, Esquire (*pro hac vice*), Reinhart Boerner Van Deuren, s.c., Madison, WI, Guy R. Temple, Esquire (*pro hac vice*) (argued), Reinhart Boerner Van Deuren, s.c., Milwaukee, WI, Attorneys for Defendant Rockline Industries, Inc.

**Jurden, P.J.**

# I. INTRODUCTION

Before the Court is Plaintiff Alltrista Plastics, LLC d/b/a Jarden Plastic Solutions' ("Jarden") Motion for Summary Judgment on its breach of contract claim against Rockline Industries, Inc. ("Rockline"), and for dismissal of Rockline's counterclaims for intentional misrepresentation, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment.[1]

# II. BACKGROUND

## A. The Parties

Jarden supplies plastic packaging solutions, including thin-wall plastic injection molded products, to a variety of industries.[2] Rockline produces, among other things, disinfecting wet wipes.[3] In 2009, Jarden approached Rockline about manufacturing wet wipe canisters for Rockline using Jarden's "LitePak" canister design.[4] LitePak canisters are thin-walled, injection molded canisters that are

---

[1] Motion for Summary Judgment ("Jarden Mot. Summ. J.") (Trans. ID. 58195759); Defendant Rockline Industries' Memorandum of Law in Opposition to Jarden's Motion for Summary Judgment ("Rockline Resp.") (Trans. ID. 58328694); Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment (Trans. ID. 58435227).
[2] Joint Pre-Trial Stipulation at 13 (Trans. ID. 58679062).
[3] *Id.*
[4] Jarden Mot. Summ. J. at 3; Rockline's Resp. at 3, Ex. C Deposition of Mike Zaagman at 69:15–21.

"lighter in weight and more bio-degradable" than traditional blow molded canisters.[5]

In November 2009, Jarden and Rockline executed a Letter of Understanding ("LOU") outlining the anticipated terms and conditions of a future supply agreement.[6] Canisters from Jarden's single cavity prototype tool were provided to Rockline in late 2009 "to allow Rockline to verify whether the [p]rototype [c]anisters would work in Rockline's manufacturing process."[7]

On October 19, 2010, Kishore Gonpati ("Gonpati"), a Rockline packaging engineer, signed a canister design drawing ("October 2010 Design Drawing") for Jarden to use in cutting an eight cavity production tool.[8] That same day, Gonpati circulated the October 2010 Design Drawing and a component specification document numbered "24021 Revision A" ("Component Specification 24021") to Jarden employees, Timothy Benz ("Benz") and Susan Braun.[9]

---

[5] Jarden Mot. Summ. J. at 3.
[6] Jarden Mot. Summ. J., Ex. E.
[7] Rockline Resp. at 3.
[8] Jarden Mot. Summ. J., Ex. G Deposition of Kishore Gonpati at 137:10–15 (Q. - - on [Jarden Mot. Summ. J., Ex. H] was that your way of telling Jarden, among other people, that the prototype tool was approved and that you could then start cutting the production tool? A. Correct.).
[9] Jarden Mot. Summ. J., Ex. B Deposition of Timothy Benz at 37:19–38:1; Jarden Mot. Summ. J., Ex. I.

## B. The Supply Agreement

Jarden and Rockline signed a contract ("Supply Agreement") on November 2, 2010.[10] Pursuant to the Supply Agreement, the "one (1) cavity prototype tool" would be modified by Jarden at Rockline's expense to become "a set of workable plastic injection tools for the production of 105[]mm cylindrical [wet] wipe canisters . . . ('Canisters')."[11] Rockline agreed to purchase "at least 13,000,000 Canisters . . . (the 'Annual Minimum')" each year, for three years, and, if Rockline did not "purchase the Annual Minimum for any reason other than Jarden's failure to supply . . . Rockline [would pay] . . . for the purchase shortfall."[12]

The Supply Agreement also provides that the total cost "for the Tool shall be $500,000.00," consisting of $200,000.00 Rockline previously paid to Jarden under the LOU and $300,000.00 Rockline agreed to pay to Jarden "within ten (10) days of Tool validation." [13]

Section 4(a) of the Supply Agreement provides that "Jarden and Rockline shall work together to reach agreed upon Specifications," and "[o]nce the parties

---

[10] Joint Pre-Trial Stipulation at 13; Jarden Mot. Summ. J., Ex. A Supply Agreement ("Supply Agreement").

[11] Supply Agreement p.1.

[12] *Id.* ¶ 1(i).

[13] *Id.* p. 1, ¶ 3(c). The Supply Agreement "supersedes and replaces the terms of any and all prior discussion, agreements or understanding between the Parties," including the November 12, 2009 Letter of Understanding. *Id.* ¶ 23; Jarden Mot. Summ. J., Ex. E.

4

reach agreed upon Specifications, Jarden shall materially conform to the respective specifications as set forth in Exhibit A" ("Canister Specifications").[14]

## C. Development of the Production Tool

According to Rockline, Rockline ordered a shipment of "TR 12" canisters, and, upon receipt, shrink wrapped pallets of the TR 12 canisters for a stack test, "with intent to then complete a final ship test."[15] When Rockline employees inspected the pallets, they reported denting, buckling, and cracking in the TR 12 canisters.[16] On March 21, 2012, Rockline informed Jarden that the canisters had failed Rockline's stack test.[17]

Jarden immediately sent a representative, Todd Zillmer ("Zillmer"), to Rockline's warehouse to view the TR 12 canisters.[18] Zillmer believed that the observed damage to the TR 12 canisters was caused by Rockline shrink wrapping the canisters too tightly.[19] Rockline, however, did not believe that the shrink wrapping caused the damage, and sent Jarden a checklist of "variables to be investigated and documented."[20] According to Rockline, the purpose of the

---

[14] Supply Agreement ¶ 4(a).
[15] Jarden Mot. Summ. J., Ex. T.
[16] *Id.*
[17] *Id.*
[18] Joint Pre-Trial Stipulation at 13.
[19] Jarden Mot. Summ. J., Ex. C June 17, 2015 Deposition of Ronald Kerscher at 168:23–169:14.
[20] Rockline Resp. at 8, Exs. S, T.

checklist was to help determine why the TR 12 canisters were not performing as well as the prototype canisters.[21]

Jarden never responded to Rockline's checklist and request for an investigation. Instead, Jarden filed the instant action alleging breach of contract against Rockline because, according to Jarden, Jarden had fulfilled its contractual obligations and it was clear that "Rockline was going to breach the Supply Agreement by refusing to order the canisters or pay the outstanding balance for the tool."[22]

Rockline then counterclaimed, alleging breach of contract, intentional misrepresentation, breach of the covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment.[23]

## III. STANDARD OF REVIEW

Superior Court Civil Rule 56 permits summary judgment when "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law."

When interpreting a contract, Delaware courts give priority to the intentions of the parties as "'reflected in the four corners of the agreement,' construing the

---

[21] *Id.*

[22] Jarden Mot. Summ. J. at 12–13.

[23] *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255 (Del. Super. Sept. 4, 2013).

agreement as a whole and giving effect to all its provisions."[24] "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[25] However, "where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence."[26] "[S]ummary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation."[27]

## IV. DISCUSSION

### A. Summary Judgment on Jarden's Breach of Contract Claim

Jarden maintains that it is entitled to summary judgment on its breach of contract claim because there is no genuine issue of material fact that: (1) Jarden manufactured canisters that conformed to the "agreed upon [Canister] Specifications;" (2) the production tool was validated; and (3) after agreeing to Canister Specifications and validating the production tool, Rockline submitted a purchase order to Jarden, thereby triggering Rockline's obligation to "take or pay" for 13,000,000 canisters annually for three years.[28]

---

[24] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).
[25] *Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citing *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).
[26] *GMG*, 36 A.3d at 783.
[27] *Id.* at 784.
[28] Jarden Mot. Summ. J. at 13–19.

Rockline argues that there are genuine issues of material fact in dispute because: (1) Jarden could not possibly manufacture canisters that conformed to "agreed upon [Canister] Specifications" because Jarden and Rockline never agreed upon Canister Specifications; (2) the production tool was never validated; and (3) Rockline never triggered its Annual Minimum purchase obligation because Rockline only ordered *trial* canisters, not *production* canisters. [29]

The key issue in this motion for summary judgment is whether Jarden and Rockline agreed upon Canister Specifications. If Jarden and Rockline never agreed upon Canister Specifications, then Jarden could not manufacture "Canisters" as contemplated by the Supply Agreement.

According to Jarden, Jarden and Rockline agreed to Canister Specifications, and Jarden manufactured canisters that conformed to those specifications.[30] However, Rockline, allegedly motivated by an inability to sell the Annual Minimum, breached the Supply Agreement by attempting to impose extracontractual performance obligations on Jarden and refusing to purchase canisters. In particular, Jarden objects to any implication that the Supply Agreement requires Jarden to fix problems "outside of its control, including . . . shrink wrapping, stacking or storing of filled canisters."[31]

---

[29] Rockline Resp. at 10–21.
[30] Jarden Mot. Summ. J. at 1–3.
[31] *Id.* at 11.

## 1. Agreed Upon Canister Specifications

The Supply Agreement unambiguously states that Rockline and Jarden "shall work together *to reach* agreed upon [Canister] Specifications," and "[o]nce the parties reach agreed upon Specifications, Jarden shall materially conform to the respective specifications as set forth in Exhibit A hereto (the 'Specifications')."[32] When Jarden and Rockline entered into the Supply Agreement, "Exhibit A" did not include any the Canister Specifications.[33]

Jarden claims that the October 2010 Design Drawing and Component Specification 24021 constitute the agreed upon Canister Specifications.[34] In support of this, Jarden cites the deposition testimony of Benz. Benz testified in his deposition that the October 2010 Design Drawing and Component Specification 24021 attached to Gonpati's pre-Supply Agreement email "appear[ed] to be the Rockline specification for the Jarden Litepak can[ister]."[35] Benz also testified that he believed that specifications were "Exhibit A" of the Supply Agreement.[36]

---

[32] ¶ 4(a) (emphasis added). The Supply Agreement also states: "The Canister will be made with a thin-wall technology, employing a thin wall, supported by an internal series of plastic ribs," and "[t]he Canister will have adequate static-load strength for automatic pressure down capping machinery." *Id.* p. 1. These provisions do not appear to be at issue.

[33] "Exhibit A" states only "(Here, insert drawings and specifications for the Canister)."

[34] Jarden Mot. Summ. J. at 5.

[35] Jarden Mot. Summ. J., Ex. B Deposition of Timothy Benz at 27:2–24.

[36] *Id.*

In further support, Jarden cites a 2012 email Benz sent to Ron Kerscher ("Kerscher"), another Rockline employee.[37] The subject line of the email reads, "Jarden documents," and attached to the email is a copy of the October 2010 Design Drawing and Component Specifications 24021. In the text of this email, Benz describes the October 2010 Design Drawing and Component Specifications 24021 as "Exhibit A."

Jarden maintains that Benz's deposition testimony, the October 2010 Design Drawing, and Component Specifications 24021 establish that there is no genuine issue of material fact in dispute that Jarden and Rockline agreed upon Canister Specifications.

The October 2010 Design Drawing, Component Specification 24021, and Gonpati's email forwarding those documents to Benz all pre-date the execution of the Supply Agreement, and these documents were not incorporated into the Supply Agreement when it was executed.[38] Therefore, if Jarden and Rockline agreed that the October 2010 Design Drawing and Component Specification 24021 constituted the Canister Specifications, the alleged agreement occurred at some point after the parties entered into the Supply Agreement.

Jarden asserts that Benz's "admission" that the October 2010 Design Drawing and Component Specification 24021 were the Canister Specifications

---

[37] Jarden Mot. Summ. J.at 6, Ex. J.
[38] Jarden Mot. Summ. J., Exs. A, I.

proves that these documents were agreed upon as contemplated by the Supply Agreement. But, Benz's deposition testimony is disputed. For example, Gonpati, the signer of the October 2010 Design Drawing and the author of the email forwarding that document and Component Specification 24021 to Benz, testified that Component Specification 24021 was a "living document" representing "the specifications to which the Jarden can[ister] had to be manufactured" "[a]s of October 19, 2010."[39] Further, Kerscher testified that although the parties "were working all along through all these working documents," **the "final specification" Jarden would be required to conform to in producing the "Canisters" was never reached by the parties.**[40] Finally, Benz testified that the October 2010 Design Drawing and Component Specifications 24021, attached as "Exhibit A" in his 2012 email, was a "preliminary spec[ification]" that had been approved, **"but the final spec[ification] had not been approved."**[41]

Because there are genuine issues of material fact in dispute with regard to whether the parties agreed upon Canister Specifications, summary judgment is inappropriate.

---

[39] Rockline's Resp., Ex. E Deposition of Kishore Gonpati at 140:7–145:23.
[40] Rockline's Resp., Ex. H June 17, 2015 Deposition of Ronald Kerscher at 37:22–38:24, 165:17–166:4 (emphasis added).
[41] Rockline's Resp., Ex. A Deposition of Timothy Benz at 243 (emphasis added).

## 2. Tool Validation

Pursuant to the Supply Agreement, Rockline agreed to pay Jarden $300,000.00 "within ten (10) days of Tool validation." "Tool validation" is not a defined term in the Supply Agreement, and examination of the Supply Agreement as a whole does not make clear what constitutes "Tool validation." Therefore, the Supply Agreement is ambiguous as to what constitutes "Tool validation." [42]

Jarden argues that Tool validation occurred on July 13, 2011, when both Jarden and Rockline employees signed a canister design drawing "pending evaporation testing" ("July 2011 Design Drawing").[43] Jarden further argues that Tool validation occurred again when the Jarden canisters passed Phase I and II of Rockline's three phase "Mold Qualification Procedure."[44]

Rockline argues that Tool validation never occurred. In support of its argument, ROckline point out that although the July 2011 Design Drawing was signed on behalf of Rockline by Donald Neitzel ("Neitzel") and Gonpati, Jarden relies upon Benz's deposition testimony to establish that Rockline "admitted" that the tool was validated by that document.[45] Neitzel and Gonpati both testified at their depositions that their signatures were intended to acknowledge that design

---

[42] For example, does validation require merely producing canisters within particular specifications or does validation require producing canisters within particular specifications over a particular period of time. *See, e.g.*, Rockline Resp., Ex. R (describing Rockline's Mold Qualification Prodcedure).

[43] Jarden Mot. Summ. J. at 8, Ex. Q.

[44] Jarden Mot. Summ. J. at 9, Ex. C at 92:4–9, Ex. K.

[45] Jarden Mot. Summ. J., Ex. Q.

changes had been incorporated into the document, without mention of "Tool validation."[46]

Second, and contrary to Jarden's assertion that Benz admitted that the production tool was validated, Benz testified: (1) he was not present when the July 2011 Design Drawing was signed; (2) neither Neitzel nor Gonpati reported back to him about the July 2011 Design Drawing; and (3) he "would not consider [the July 2011 Design Drawing to be] a tool validation."[47]

Finally, with respect to Jarden's argument that completion of Phase II of Rockline's Mold Qualification Procedure validated the production tool, whether Phase II Mold Qualfication Procedure completion constitutes "Tool validation" under the "proper interpretation" of the Supply Agreement is an issue of fact to be decided by the jury.[48]

There are genuine issues of material fact in dispute as to whether the production tool was validated, as required by the Supply Agreement to trigger Rockline's obligation to pay Jarden the $300,000.00 balance of the total cost.

---

[46] Rockline Resp, Ex. E Deposition of Kishore Gonpati at 346:24–347:20 ("[I]t's a change of design we have to redo all the validation for this part."); Rockline Resp., Ex. F Deposition of Donald Neitzel at 149:21–152:5.

[47] Rockline Resp., Ex. A Deposition of Timothy Benz at 227:13–230:23.

[48] *GMG*, 36 A.3d at 784.

## B. Summary Judgment on Rockline's Counterclaims

### 1. Intentional Misrepresentation

Rockline alleges that Jarden intentionally misrepresented the material characteristics of the prototype canisters, intending to induce Rockline into a contract. To prove a claim of intentional misrepresentation, Rockline must show: (1) that Jarden made a false representation to Rockline; (2) with knowledge or belief of its falsity or with reckless indifference to the truth; (3) with intent to induce action or inaction; (4) that Rockline's response was taken in justifiable reliance on the representation; and (5) an injury resulting from such reliance.[49]

Jarden argues that there is no evidence to support Rockline's claim that Jarden represented to Rockline that it would "produce canisters from an eight-cavity production tool that were *the same* as the Prototype Canisters made from the single-cavity Prototype Tool."[50] More specifically, Jarden argues that it is manifest that Jarden could not have represented that the production canisters would be "*the same*" because changes to the canister design were approved by Rockline throughout the development process.[51]

---

[49] *Alltrista*, 2013 WL 5210255, at *3 (citing *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *12 (Del. Super. Feb. 15, 2013)).

[50] Jarden Mot. Summ. J. at 21 (quoting Defendant's Answer, Affirmative Defenses and Counterclaims ¶ 22 ("Rockline Answer and Countercls.") (Trans. ID. 48066735)) (emphasis in Jarden Mot. Summ. J.).

[51] Jarden Mot. Summ. J. at 21, Ex. BB at 7–8.

Rockline challenges Jarden's characterization of Rockline's allegations of intentional misrepresentation. Rockline asserts that Jarden represented that the production canisters would have the same material composition as the prototype canisters.[52] Specifically, Rockline points to a September 2010—pre-Supply Agreement—email exchange between Mike Zaagman ("Zaagman"), a Jarden employee, and Benz, a Rockline employee.[53] In this exchange, Benz notifies Zaagman that the Litepak material specification in Rockline's possession did not identify who Jarden's resin supplier was or what resin number Jarden utilized in its production.[54] Benz asked Zaagman to supply this information.[55] In response, Zaagman stated that he "forwarded the material spec[ification] sheet for the polypropylene based material already . . . [it] is a Jarden specialty blend."[56] To support its assertion that this exchange evidences an actionable misrepresentation, Rockline points to evidence that the resin used in the prototype canisters was not a "specialty blend," and that the material characteristics of the production canister were significantly different than the prototype canisters.[57]

There are genuine issues of material fact in dispute with regard to whether Jarden intentionally misrepresented the material composition of the prototype

---

[52] Rockline Resp. at 27–28.
[53] Rockline Resp., Ex. W.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] Rockline Resp., Ex B Deposition of Chris Navratil at 383:14–23, Ex. O Expert Report of Paul J. Gramann at 19.

15

canister with the intent to induce Rockline to enter the Supply Agreement, and whether Rockline reasonably relied on those misrepresentations.[58]

Jarden argues that the parol evidence rule and the economic loss doctrine preclude Rockline's intentional misrepresentation claim.[59] First, to the extent that Jarden's parol evidence argument rehashes its argument that the Supply Agreement's integration clause precludes Rockline's intentional misrepresentation claim, the Court will not reconsider its conclusion that "[b]ecause the Supply Agreement's integration clause contains no explicit anti-reliance language, Rockline is not barred from bringing a claim for intentional misrepresentation."[60] Second, the parol evidence rule does not bar proof of claims alleging fraud in the inducement of a contract.[61] And last, the economic loss rule does not preclude Rockline's intentional misrepresentation claim because the allegations go to the inducement of the contract, not to Jarden's performance.[62]

---

[58] Rockline's Counterclaims were amended to conform its intentional misrepresentation claim to the evidence proffered on Jarden's Motion for Summary Judgment. Pretrial Stipulation at 33–37; Mar. 7, 2016 Amended Judicial Action Form (Trans. ID. 58688961).

[59] Jarden Mot. Summ. J. at 22–26; *see Brasby v. Morris*, 2007 WL 949485, at *7 (Del. Super. Mar. 29, 2007) ("[A]s a general rule, 'in order for contract and tort claims to co-exist in an action, the plaintiff must allege that the defendant breached a duty that is independent of the duties imposed by the contract.'") (quoting *McKenna v. Terminex Int'l Co.*, 2006 WL 1229674, at *2 (Del. Super. Mar. 13, 2006)).

[60] *Alltrista*, 2013 WL 5210255, at *6.

[61] 26 Williston on Contracts § 69:2 (4th ed.) (citing Restatement (Second) of Contracts § 216) ("A written contract containing a merger clause can nevertheless be avoided for antecedent fraud or fraud in its inducement, and the parol evidence rule does not stand in the way of proof of such fraud.").

[62] *Brasby*, 2007 WL 949485, at *7.

16

## 2. Breach of the Covenant of Good Faith and Fair Dealing

Jarden argues that Rockline's counterclaim for breach of the covenant of good faith and fair dealing should be dismissed because "the implied covenant of good faith and fair dealing will not add requirements to a contract."[63] This Court denied Jarden's Motion to Dismiss on Rockline's claim of breach of the implied covenant of good faith and fair dealing because Rockline sufficiently alleged a specific implied contractual obligation that Jarden and Rockline would work together to determine why the canisters failed.[64] The Court will not revisit the decision.

## 3. Promissory Estoppel and Unjust Enrichment

Jarden argues that the Court should grant summary judgment on Rockline's promissory estoppel claim because "Rockline seeks to recover [payments] in this action [that] are contemplated and/or otherwise precluded by the Supply Agreement, making promissory estoppel an inappropriate means to recover those funds."[65] Similarly, Jarden argues that Rockline cannot recover on a claim of unjust enrichment because the Supply Agreement is the measure of the parties' rights in this case.

---

[63] Jarden Mot. Summ. J. at 27.
[64] *Alltrista*, 2013 WL 5210255, at *7.
[65] Jarden Mot. Summ. J. at 29–30.

17

In its decision on Jarden's Motion to Dismiss, the Court held, "[t]o the extent that Rockline has made payments that are expressly contemplated by the Supply Agreement, it must seek to recover that money under its breach of contract claim."[66] Rockline does not dispute this decision, but argues that damages on its promissory estoppel claim and unjust enrichment claim would encompass costs incurred by Rockline *before* the execution of the Supply Agreement. And, in the event of rescission, the Supply Agreement would no longer preclude recovery of damages in tort.[67]

Jarden has not met its burden of proof as the moving party on summary judgment to show that there are no genuine issues of material fact relating to Rockline's ability to show damages on its promissory estoppel or unjust enrichment claims.[68]

---

[66] *Alltrista*, 2013 WL 5210255, at *10.

[67] Rockline Resp. at 32–33.

[68] Jarden's arguments about Rockline's potential damages if the parties relationship defaults to the LOU were raised for the first time in its reply brief. The record is not sufficient for the Court to rule on these arguments, and the Court will not consider them at this time. *In re Asbestos Litig.*, 2012 WL 2389898, at *1 (Del. Super. June 22, 2012) ("The practice of adding arguments for summary judgment after the opening brief 'has been expressly prohibited by this Court' numerous times.") (quoting *In re Asbestos Litig.:Montgomery*, 2011 WL 5395554, at *3 (Del. Super. Sept. 28, 2011)).

## V. CONCLUSION

For the foregoing reasons, Plaintiff Alltrista Plastics, LLC d/b/a Jarden Plastic Solutions' Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

/s/Jan R. Jurden
Jan. R. Jurden, President Judge