**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 20, 2022

Scott J. Leonhardt, Esquire
The Rosner Law Group LLC
924 North Market Street, Suite 810
Wilmington, Delaware 19801

Laurence V. Cronin, Esquire
Smith, Katzenstein & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, Delaware 19801

RE: *Jason Terrell v. Kiromic Biopharma, Inc.*,
Civil Action No. 2021-0248-MTZ

Dear Counsel:

The disputes in this case turn on competing interpretations of a suite of documents granting stock options in a biotechnology company to its former director. The company contends language in the notice granting the director's most recent options extinguished two earlier, more lucrative option grants. The director argues the language preserves those options. The company filed the pending motion to dismiss seeking to confirm its interpretation.

At oral argument on that motion, I raised a threshold issue the parties did not brief: a dispute resolution provision in the stock option agreement, requiring the parties to submit "[a]ny dispute regarding the interpretation of this Agreement" to a committee of the company's board. The parties also disagree as to whether that provision governs their dispute over the option grant language.

I endeavored to resolve their competing interpretations of the dispute resolution provision, but encountered a circular problem along the way. Interpreting the dispute resolution provision would require me to resolve a "dispute regarding the interpretation" of the stock option agreement, violating that dispute resolution provision. Faced with this Mobius strip, I look to this Court's jurisprudence governing how to interpret arbitration and non-arbitration dispute resolution provisions. Because the dispute resolution provision does not call for arbitration, it must be construed in accordance with its plain text. The text commands that the referenced committee must interpret the dispute resolution provision to determine its scope. So for the reasons that follow, the matter is stayed pending the committee's determination.

## I.    BACKGROUND[1]

Plaintiff Dr. Jason Terrell is a former consultant and director at Kiromic Biopharma, Inc. ("Kiromic" or the "Company"), a biopharmaceutical company based in Houston, Texas. Terrell was affiliated with Kiromic from 2014 until he

---

[1] For the purposes of the pending motion, I draw the following facts from the plaintiff's Verified Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

resigned from its board in 2019. During that time, the Company compensated Terrell by granting him a series of stock options. For the purposes of this letter, I adopt Terrell's characterizations of these transactions as "Agreement 1," "Agreement 2," and "Agreement 3." I do not describe Agreement 1 and Agreement 2 here, as they are known to the parties and not relevant here.

What is relevant here is Agreement 3, which comprises three parts: a Notice of Stock Option Grant (the "Grant Notice"),[2] a stock option agreement (the "Stock Option Agreement"),[3] and an annex, which contains ancillary documents including a 2017 Equity Incentive Plan (the "Incentive Plan").[4] Terrell's Agreement 3 options generally resemble his options under Agreements 1 and 2, but there are two critical differences.

First, only his Agreement 3 options would be adjusted if the Company changed its capital structure by a stock split or a reverse stock split.[5] Two stock splits in 2019 and 2020 adjusted Terrell's Agreement 3 options to the right to purchase 14,285 shares at a strike price of approximately $6.65 per share.

---

[2] *See* Compl. Ex. D, Notice of Stock Option Grant [hereinafter "Grant Notice"].

[3] *See* Grant Notice, Ex. A, Stock Option Agreement [hereinafter "Stock Option Agr."].

[4] *See* Stock Option Agr., Annex A, 2017 Equity Incentive Plan [hereinafter "Incentive Plan"]. The annex also includes a "Stock Option Exercise Notice and Agreement."

[5] *See id.* § 2.2.

These changes to Terrell's Agreement 3 options were amplified because of the second critical difference in Agreement 3. Its Grant Notice includes the following italicized language:

> *By signing this Grant Notice, you acknowledge and agree that other than the Shares, you have no other rights to any other options, equity awards or other securities of the Company (except securities of the Company, if any, issued to you on or prior to the date hereof, if any), notwithstanding any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in your offer letter, consultant agreement or other documentation with the Company or any of its predecessors.*[6]

I refer to this provision as the "Release."

Kiromic contends the Release extinguishes Terrell's options under Agreements 1 and 2. Kiromic informed Terrell he holds only his Agreement 3 options, and challenged his right to any others. Terrell argues that the Release's parenthetical exception carves out his options under Agreements 1 and 2. Under Terrell's interpretation, his option holdings are more plentiful and more lucrative: 500,000 shares at $0.50 per share (the Agreement 1 options), 500,004 shares at $0.17

---

[6] Grant Notice at 2.

per share (the Agreement 2 options),[7] and 14,285 shares at $6.65 per share (the Agreement 3 options).

Terrell filed his verified complaint in this matter (the "Complaint") on March 22, 2021.[8] The Complaint asserts two counts, both seeking declaratory judgments that his options under Agreements 1 and 2 survive the Release in Agreement 3's Grant Notice.[9] Kiromic moved to dismiss (the "Motion") on May 20.[10] As initially framed, the parties' dispute turns on their competing interpretations of the Release. The parties briefed the Motion and the Court heard oral argument on October 20.[11]

In preparation for oral argument, I came across Section 15.1 of Agreement 3's Stock Option Agreement, which governs its interpretation:

---

[7] The Complaint indicates Terrell received 500,005 options in Agreement 2, while Agreement 2 itself indicates 500,004. *Compare* Compl. ¶ 17, *with* Compl. Ex. C § 6.

[8] *See generally* Compl.

[9] Terrell's Complaint also sought indemnification from the Company under its amended certificate of incorporation. *See id.* ¶¶ 37–39, 50, 59. Terrell withdrew his indemnification claims in his answering brief on the Motion. *See* D.I. 16 at 2.

[10] *See* D.I. 12.

[11] *See* D.I. 22.

> **Interpretation.** Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee [Terrell] or the Company to the Committee for review. The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee.[12]

The Incentive Plan defines the "Committee" as a committee created by the Company's board or, if no committee is created, the Kiromic board itself.[13]

Though neither party discussed Section 15.1 in their initial submissions, the Court has a mandate to construe "the agreement as a whole and giv[e] effect to all its provisions."[14] At argument, I asked whether the parties' dispute over the Release is one "regarding the interpretation of this Agreement,"[15] which must be submitted to the Committee. The parties submitted supplemental briefs on that issue on November 15.[16]

Those supplemental briefs presented a dispute over the interpretation of Section 15.1 and other parts of the Stock Option Agreement. Kiromic argues the provision bars Terrell from asking this Court to interpret the Grant Notice, because

---

[12] Stock Option Agr. § 15.1.

[13] *See* Incentive Plan § 14 (defining "Committee"). Kiromic represented in its supplemental brief that such a committee exists. *See* D.I. 26 at 3 n.2.

[14] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (citing *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[15] Stock Option Agr. § 15.1.

[16] D.I. 25; D.I. 26.

the Grant Notice incorporates and is incorporated by reference into the Stock Option

Agreement.[17]  Terrell contends his suit is not barred because Section 15.1 references

only the "Agreement," which the Stock Option Agreement defines as the Stock

Option Agreement itself. [18]

## II.    ANALYSIS

Kiromic moved to dismiss the Complaint under Court of Chancery Rule

12(b)(6) for failure to state a claim for relief.[19]  The standards governing such a

motion are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even
> vague allegations are "well-pleaded" if they give the opposing party
> notice of the claim; (iii) the Court must draw all reasonable inferences
> in favor of the non-moving party; and ([iv]) dismissal is inappropriate
> unless the "plaintiff would not be entitled to recover under any
> reasonably conceivable set of circumstances susceptible to proof."[20]

The parties' initial dispute turns on competing interpretations of the Release.

Their secondary dispute turns on competing interpretations of Section 15.1.  As I

will    explain,    under    Delaware's    alternative    dispute    resolution    ("ADR")

---

[17] *See* D.I. 26 at 2 (citing Grant Notice at 1, and Stock Option Agr. § 15.2).

[18] *See* D.I. 25 at 2 (citing Stock Option Agr. at 1).

[19] *See generally* D.I. 12.  In its supplemental brief, Kiromic also argued Section 15.1 rendered the dispute unripe, calling into question this Court's subject matter jurisdiction under Rule 12(b)(1).  *See* D.I. 26 at 4–5.

[20] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

jurisprudence, resolving these disputes requires asking and answering the following

questions in the following way:[21]

Question 1: What type of provision is Section 15.1: an arbitration provision, or something else?

Answer 1: Section 15.1 is not an arbitration provision.

Question 2: Who decides whether a non-arbitration ADR provision applies to the dispute at hand?

Answer 2: The plain text of a non-arbitration ADR provision dictates who decides its scope.

Question 3: Who does the plain text of Section 15.1 charge with deciding its applicability?

Answer 3: Section 15.1's plain text charges the Committee with deciding its applicability.

I will endeavor to lead the parties through these nested questions and answers. I

conclude that this action must be stayed so that the Committee can determine

whether Section 15.1, in the Stock Option Agreement, governs the dispute over the

Release, in the Grant Notice.

---

[21] *See generally Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 453–466 (Del. Ch. 2018) (framing and answering the questions "Does Delaware Recognize A Distinction Between An Arbitration And An Expert Determination?"; "What Type Of Proceeding Does The Merger Agreement Contemplate?"; and "Who Determines The Scope Of The Accounting Firm's Jurisdiction?" in analyzing an ADR provision).

### A. Section 15.1 Is Not An Arbitration Provision.

The first step in the analysis is determining whether the parties intended Section 15.1 to act as an arbitration provision. "Determining what type of dispute resolution mechanism the parties have agreed to presents a question of contract interpretation."[22] I am guided by Delaware's well-understood objective theory of contracts in that exercise.[23]

> In some cases, it might be difficult to determine whether the parties had selected an expert determination, arbitration, or something else. If parties have not stated their intention explicitly, then a court will have to examine other aspects of the contract or even turn to extrinsic evidence.[24]

Vice Chancellor Laster's scholarly decision in *Penton Business Media Holdings, LLC v. Informa PLC* noted state and federal courts have taken varying approaches to categorizing different types of alternative dispute resolution paradigms.[25] *Penton* approvingly discussed New York's system, which "places

---

[22] *Id.* at 461.

[23] *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[24] *Penton*, 252 A.3d at 462.

[25] *Id.* at 463.

heavy weight on the scope of the provision and the procedure that the parties agree to follow."[26]  I follow that approach.

Generally speaking, "[t]he grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial proceeding."[27]  Arbitrators have the authority to "decide all legal and factual issues necessary to resolve the matter" and to "award a legal remedy."[28]  An expert's authority is generally "limited to its mandate to use its specialized knowledge to resolve a specified issue of fact. The parties agree that the expert's determination of the disputed factual issue will be final and binding on them[,]" but do not usually grant the expert authority to determine issues like legal liability.[29]

---

[26] *Id.*; *see id.* at 464 (noting New York's system is in line with academic authorities that consider factors such as "the type and scope of authority given to the party resolving the dispute," as well as "the procedures that the party is directed to follow").  *Penton* included a lengthy discussion of a 2013 report by the Committee on International Commercial Disputes of the New York City Bar Association.  *See generally* Comm. on Int'l Com. Disputes, N.Y.C. Bar Ass'n, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013) [hereinafter "New York Bar Report"].

[27] *Id.* at 464 (quoting New York Bar Report at 4); *see also Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *8 (Del. Ch. Jan. 29, 2019) ("Arbitration provisions typically broadly encompass the entire legal and factual dispute between the parties.").

[28] *Penton*, 252 A.3d at 464 (quoting New York Bar Report at 4).

[29] *Id.* (quoting New York Bar Report at 4).

The procedures for arbitration and expert determinations also differ. "Arbitration provisions typically include procedural rules affording each party the opportunity to present its case; indeed, this is viewed as a defining characteristic of arbitration provisions."[30] By contrast, expert proceedings are typically "attended by a larger measure of informality and [experts] are not bound to the strict judicial investigation of an arbitration."[31]

The parties did not brief whether Section 15.1 calls for arbitration, an expert determination, a referee, or something else. I conclude it does not call for arbitration. Section 15.1 does not grant the Committee powers to resolve all legal and factual disputes, "analogous to the powers of a judge in a judicial proceeding."[32] Its scope is narrower, limited to disputes over the Stock Option Agreement's interpretation. Nor does Section 15.1 give the Committee the power to award a remedy. As far as process, Section 15.1 does not "include procedural rules affording each party the

---

[30] *Ray Beyond*, 2019 WL 366614, at *7 (footnotes and internal quotation marks omitted) (quoting Gary B. Born, *International Arbitration: Law and Practice* § 1.01[A][4] (2nd ed. 2016), and compiling sources); *see also James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80–81 (Del. 2006) (discussing the impact of incorporating American Arbitration Association rules into an arbitration provision).

[31] *Penton*, 252 A.3d at 463 (internal quotation marks omitted) (quoting *In re Delmar Box Co.*, 127 N.E.2d 808, 811 (N.Y. 1955)).

[32] *Id.* at 464 (quoting New York Bar Report at 4).

opportunity to present its case,"[33] nor does it bind the Committee to "the strict judicial investigation of an arbitration."[34] There is no basis to conclude the parties intended Section 15.1 to be an arbitration provision.

Section 15.1 is not squarely an "expert determination" either. It directs legal, not factual, questions to the Committee.[35] *Penton* acknowledged that provisions calling for expert determinations "normally have not granted the expert the authority to make binding decisions on general issues of law or legal disputes."[36] But *Penton* also noted "parties could give an expert the authority to interpret a contract."[37]

I conclude that Section 15.1 gives the Committee the authority to interpret the Agreement, but is not an arbitration provision.

---

[33] *Ray Beyond*, 2019 WL 366614, at *7.

[34] *Penton*, 252 A.3d at 463 (internal quotation marks omitted) (quoting *Delmar Box*, 127 N.E.2d at 811).

[35] *See id.* at 464 (discussing the differences between expert determinations and arbitration and noting that experts' authority is typically limited to a "specific factual dispute," as opposed to making "binding decisions of law"). Section 15.1 loosely resembles the "referee" provision at issue in *Kuhn Construction, Inc. v. Diamond State Port Corp.*, which reserved questions "concerning the interpretation of Plans and Specifications" for the referee. 990 A.2d 393, 394 (Del. 2010). The Delaware Supreme Court held that this provision did not compel the parties to arbitrate their disputes. *See id.* at 396–98. *Penton* reiterated this holding and cited *Kuhn* as an example of a "Delaware decision[] [that] maintained the distinction between an arbitration and an expert determination." *See* 252 A.3d at 456 & n.44.

[36] *Penton*, 252 A.3d at 466 (internal quotation marks omitted) (quoting New York Bar Report at 15).

[37] *Id.* at 448.

B.     **The Plain Text Of A Non-Arbitration ADR Provision Dictates Who Decides Its Scope.**

It was important to decide whether Section 15.1 is an arbitration provision because that informs how to determine who decides its applicability to the dispute over the Release.  If Section 15.1 were an arbitration provision, this Court would presumptively decide whether the Court or the Committee should determine its scope, pursuant to *James & Jackson, LLC v. Willie Gary, LLC*.[38]  *Willie Gary* held that questions of substantive arbitrability are presumptively decided by a court, absent "clear and unmistakable" evidence of the parties' intent to have the arbitrator make that decision instead.[39]

But because Section 15.1 does not call for arbitration, the *Willie Gary* presumption of judicially determined substantive arbitrability does not apply. Unlike other jurisdictions, Delaware "does not apply arbitral principles" in

---

[38] *See* 906 A.2d at 79 ("The question of whether the parties have submitted a particular dispute to arbitration, *i.e.* the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.  The [United States Supreme Court] distinguished between issues of substantive arbitrability and procedural arbitrability.  Substantive arbitrability issues are gateway questions about the scope of an arbitration provision and its applicability to a given dispute.  The court presumes that parties intended courts to decide issues of substantive arbitrability." (alterations and internal quotation marks omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002))).

[39] *Id.*

construing private dispute resolution mechanisms that do not call for arbitration.[40]

Where an ADR provision calls for something other than arbitration, the Court applies contract interpretation principles to determine whether the arbiter could construe that provision. As *Penton* put it:

> Holding that the Dispute Resolution Provision calls for an expert determination means that the contract itself determines the scope of the expert's jurisdiction. Where the parties have entrusted the power of decision to an expert, the extent of the expert's jurisdiction depends on the terms of the contract between the parties.
>
> Whether the [expert] has jurisdiction to construe the scope of the Dispute Resolution Provision and determine whether it can consider extrinsic evidence presents a question of contract interpretation. There is no general principle either that the expert *always* has exclusive jurisdiction to decide the meaning of the terms of the contract, or that the expert *never* has exclusive jurisdiction to do so. ***Rather, in each case it is necessary to examine the contract itself in order to decide what the parties intended should be a matter for the exclusive decision of the expert.***
>
> . . .

---

[40] *See Penton*, 252 A.3d at 459; *see also id.* at 454 ("The buyer posits that arbitral principles, including the doctrines of substantive and procedural arbitrability, always apply whenever parties have selected a private third-party to decide a dispute. They rely on cases which hold that 'if the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration.' In my view, those cases speak too broadly. Most importantly for present purposes, Delaware decisions distinguish between expert determinations and arbitrations." (alteration omitted) (quoting *Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013))).

> The Merger Agreement does not specifically say whether or not the [expert] can construe the Dispute Resolution Provision. Although Delaware cases have not expressly adopted a default rule for use when the agreement is silent, the logic of the decisions suggests that an expert charged with making a narrow determination will not have authority to interpret the governing agreement ***unless the contract says so***.[41]

Because Section 15.1 is not an arbitration provision, the answer to who is charged with interpreting it is found in its plain text, without applying any arbitral presumptions.[42]

---

[41] *Id.* at 465–66 (footnotes, alterations, and internal quotation marks omitted) (bold italics added) (quoting Clive Freedman & James Farrell, *Kendall on Expert Determination* 245 & 256 (5th ed. 2015)).

[42] *See id.* at 448 ("Delaware has not elided the distinction between expert determinations and arbitrations, nor have our courts applied arbitral principles to all contractual dispute resolution mechanisms. This outcome comports with Delaware's position as a freedom of contract state, with a policy of enforcing the voluntary agreements of sophisticated parties in commerce. As Chief Justice Strine recognized while writing as Chancellor on this court, Delaware is a state that respects the freedom of contract. Thus, when two parties have a contract on which payment must be made, they are free to determine the basis for that payment. When a contract plainly says that a contractual input (the value of a certain property) will be determined by an appraiser selected in accordance with the contract's terms, that is what it plainly means. An expert determination—whether by an appraiser, an auditor, or a different type of expert—is not an arbitration unless the parties specifically designate that expert as an arbitrator for that purpose, thereby invoking the body of law governing arbitrators. The court interprets and enforces the contract provisions governing the expert determination; the court does not apply arbitral principles." (footnotes and internal quotation marks omitted) (quoting *Pers. Decisions, Inc. v. Bus. Plan. Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008), *aff'd*, 970 A.2d 256 (Del. 2009) (TABLE), and *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *24–25 (Del. Ch. May 13, 2013))).

C. **Section 15.1's Plain Text Charges The Committee With Deciding Its Applicability.**

The plain text of Section 15.1 provides that the Committee must determine Section 15.1's scope. The parties specifically delegated the Committee the authority to interpret the "Agreement."[43] The Stock Option Agreement defines "Agreement" as the Stock Option Agreement itself:

> This Stock Option Agreement (this "Agreement") is made and entered into as of the date of grant (the "Date of Grant") set forth on the Notice of Stock Option Grant attached as the facing page to this Agreement (the "Grant Notice") by and between Kiromic, Inc., a Delaware corporation (the "Company"), and the optionee named on the Grant Notice ("Optionee").[44]

Notwithstanding whether the "Agreement" extends to the Grant Notice, as Kiromic contends, it unquestionably includes the Stock Option Agreement. The parties' arguments on Section 15.1's scope, which invoke several Stock Option Agreement provisions,[45] turn almost exclusively on questions of that agreement's interpretation. Section 15.1 is a provision of the Stock Option Agreement; under its plain text, a dispute over its scope is a decision for the Committee.

---

[43] Stock Option Agr. § 15.1.

[44] Stock Option Agr. at 1.

[45] *See* D.I. 25 at 1–5 (discussing, *inter alia*, Stock Opt. Agr. §§ 1, 2.1, 15.1, 15.2, 18, 22); D.I. 26 at 1–4 (discussing, *inter alia*, Stock Opt. Agr. §§ 15.1, 15.2).

And so, out of respect for the parties' agreement, I end my analysis there. This matter will be stayed until the Committee determines whether Section 15.1 applies to the parties' dispute over the Release in the Grant Notice. If the Committee determines it does, the parties shall submit their competing interpretations of the Release to the Committee for its review. The parties shall inform the Court of the Committee's decision(s).

## III. CONCLUSION

For the foregoing reasons, this matter is **STAYED** pending the Committee's decision on the applicability of Section 15.1 to the parties' dispute. To the extent the following requires an order to take effect, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*